# United States Court of Appeals for the Federal Circuit

2007-5083

NEBRASKA PUBLIC POWER DISTRICT,

Plaintiff-Appellant,

v.

UNITED STATES,

Defendant-Appellee.

Jay E. Silberg, Pillsbury Winthrop Shaw Pittman LLP, of Washington, DC, argued for plaintiff-appellant. With him on the brief were Alex D. Tomaszczuk, Daniel S. Herzfeld, and Jack Y. Chu, of McLean, Virginia.

Harold D. Lester, Jr., Assistant Director, Commercial Litigation Branch, Civil Division, United States Department of Justice, of Washington, DC, argued for defendant-appellee. With him on the brief were Tony West, Assistant Attorney General, Jeanne E. Davidson, Director, Alan J. Lo Re, Assistant Director, and Andrew P. Averbach and Christopher J. Carney, Trial Attorneys. Of counsel was Jane K. Taylor, Attorney, United States Department of Energy, of Washington, DC.

Brad Fagg, Morgan, Lewis & Bockius LLP, of Washington, DC, for amici curiae Arizona Public Service Company, et al. With him on the brief were M. Stanford Blanton, Balch & Bingham LLP, of Birmingham, Alabama, for Southern Nuclear Operating Company, et al.; David A. Churchill, Jenner & Block LLP, of Washington, DC, for Consolidated Edison of New York, Inc.; Richard James Conway, Dickstein Shapiro LLP, of Washington, DC, for Boston Edison Company; Norman M. Hirsch, Jenner & Block, LLP, of Chicago, Illinois, for Energy Northwest; Richard W. Oehler, Perkins Coie LLP, of Seattle, Washington, for Wisconsin Electric Power Company; and Jerry Stouck and Robert Shapiro, Greenberg Traurig, LLP, of Washington, DC, for Yankee Atomic Energy Company, et al.

James Bradford Ramsay, National Association of Regulatory Utility Commissioners, of Washington, DC, for amicus curiae The National Association of Regulatory Utility Commissioners.

Appealed from: United States Court of Federal Claims

Judge Francis M. Allegra

# United States Court of Appeals for the Federal Circuit

2007-5083

NEBRASKA PUBLIC POWER DISTRICT,

Plaintiff- Appellant,

v.

UNITED STATES,

Defendant-Appellee.

Appeal from the United States Court of Federal Claims
in 01-CV-116, Judge Francis M. Allegra.

_____

DECIDED:  January 12, 2010

_____

Before MICHEL, Chief Judge, and NEWMAN, MAYER, LOURIE, RADER, SCHALL, BRYSON, GAJARSA, LINN, DYK, PROST, and MOORE, Circuit Judges.

Opinion for the court filed by Circuit Judge BRYSON, in which Chief Judge MICHEL and Circuit Judges NEWMAN, MAYER, LOURIE, RADER, SCHALL, LINN, DYK, PROST, and MOORE join.  Concurring opinion filed by Circuit Judge DYK, in which Circuit Judge LINN joins.  Dissenting opinion filed by Circuit Judge GAJARSA.

BRYSON, Circuit Judge.

This case requires us to address a difficult question involving the allocation of jurisdiction between regional circuit courts and the Court of Federal Claims.  The dispute in this case centers on the interaction between a provision of the Nuclear Waste Policy Act ("NWPA"), 42 U.S.C. §§ 10101-10270, and a government contract with a utility company that operates a nuclear power facility.

The NWPA authorizes the United States Department of Energy ("DOE") to enter into contracts with nuclear power producers to dispose of the high-level radioactive waste and spent nuclear fuel produced by nuclear power plants. The statute requires the contracts to provide that in return for the payment of fees by the nuclear power producers, DOE would begin disposing of the spent nuclear fuel and high-level radioactive waste no later than January 31, 1998. 42 U.S.C. § 10222(a)(5)(B).

DOE did not begin accepting nuclear waste in 1998. Several years later, Nebraska Public Power District ("NPPD"), which had entered a nuclear waste disposal contract with DOE, filed a breach of contract action in the Court of Federal Claims. A central issue in the breach of contract action was whether prior decisions of the United States Court of Appeals for the District of Columbia Circuit interpreting DOE's obligations under the NWPA were binding on the parties in the action before the Court of Federal Claims. The Court of Federal Claims held that the D.C. Circuit's rulings were void because the D.C. Circuit lacked jurisdiction in the prior statutory review proceedings. Neb. Pub. Power Dist. v. United States, 73 Fed. Cl. 650 (2006). That issue is now before us on interlocutory review. We hold that the D.C. Circuit had jurisdiction to review DOE's compliance with the NWPA, and that the mandamus order issued by the D.C. Circuit in that proceeding is not void. We therefore reverse the order of the Court of Federal Claims and remand to that court for further proceedings.

I

A

Spent nuclear fuel and high-level radioactive waste are by-products of the operation of nuclear power plants. Because those substances remain dangerously

2007-5083                                    2

radioactive for many years, disposing of them requires a safe, secure, and permanent disposal facility. In 1983, Congress sought to fashion a comprehensive solution to the challenge of nuclear waste disposal by enacting the NWPA, which authorized DOE to construct a suitable permanent storage facility for the nuclear material and made further provision for the construction of interim storage facilities.

While Congress assigned DOE the task of constructing the permanent storage facility, it provided that the costs of disposal "should be the responsibility of the generators and owners of such waste and spent fuel." 42 U.S.C. § 10131(a)(4). Accordingly, Congress authorized DOE to enter into contracts with nuclear power providers to dispose of their nuclear waste in return for the payment of fees. 42 U.S.C. § 10222(a)(1). With respect to the contents of the contracts, section 302(a)(5) of the statute required the following:

> (5) Contracts entered into under this section shall provide that—
>
> (A)  following commencement of operation of a repository, the Secretary shall take title to the high-level radioactive waste or spent nuclear fuel involved as expeditiously as practicable upon the request of the generator or owner of such waste or spent fuel; and
>
> (B)  in return for the payment of fees established by this section, the Secretary, beginning not later than January 31, 1998, will dispose of the high-level radioactive waste or spent nuclear fuel involved as provided in this subchapter.

42 U.S.C. § 10222(a)(5). The NWPA further provided that the Nuclear Regulatory Commission "shall not issue or renew a license" to any utility using a nuclear power facility unless the utility has entered into a contract under section 302 or is negotiating with the Secretary to enter into such a contract. Id. § 10222(b)(1)(A).

2007-5083                                      3

Pursuant to its statutory rulemaking authority, DOE promulgated a regulation in 1983 containing what it termed the "Standard Contract for Disposal of Spent Nuclear Fuel and/or High-Level Radioactive Waste." 48 Fed. Reg. 16,590 (Apr. 18, 1983) (codified at 10 C.F.R. § 961.11). In accordance with section 302(a)(5)(B) of the NWPA, the Standard Contract contained a provision setting January 31, 1998, as the deadline for DOE's acceptance of nuclear waste. 48 Fed. Reg. at 16,600 (codified at 10 C.F.R. § 961.11, Art. II). In response to questions about the remedies that would be available to ensure that DOE would perform its contractual obligations in a timely fashion, and in particular that it would meet the 1998 deadline, DOE stated, "The 1998 date is called for in the Act, and we believe it to be a realistic date. Our performance will be judged by meeting this date." 48 Fed. Reg. at 16,598.

Under the mandatory nuclear waste contracts, the utilities began making payments to DOE, and they have continued to do so since that time. At present, the licensed nuclear power utilities make a total of $750 million in payments under the contracts each year. To date, however, DOE has not accepted any nuclear waste from any of the utilities.

By 1994, it had become clear that DOE was not going to have a permanent repository ready to accept nuclear waste by the statutory deadline of January 31, 1998. In recognition of that reality, DOE conducted a notice-and-comment proceeding to address the extent of DOE's obligations under the NWPA. At the outset of that proceeding, DOE announced its "preliminary view" that, although it "may have created an expectation that it would begin accepting such spent nuclear fuel in 1998," it had no

statutory or contractual obligation to accept nuclear waste beginning in 1998 if it did not have an operational repository or other facility constructed in accordance with the NWPA by that time.  59 Fed. Reg. 27,007, 27,008 (May 25, 1994).

After inviting and receiving comments on that issue of statutory construction, DOE issued what it termed its "Final Interpretation of Nuclear Waste Acceptance Issues," 60 Fed. Reg. 21,793 (May 3, 1995) ("Final Interpretation").  In the Final Interpretation, DOE acknowledged that it would not be able to begin accepting nuclear waste by the January 31, 1998, deadline and in fact projected that "the earliest possible date for acceptance of waste for disposal at a repository is 2010."  Id. at 21,794.  The agency took the position, however, that it did not have an unconditional obligation under the statute or the Standard Contract to accept nuclear waste by 1998.  DOE explained that it interpreted the NWPA to mean that the statutory deadline did not apply if DOE did not have a facility available to accept nuclear waste by that date.  Id. at 21,794-95.

C

A number of utilities, states, and state agencies filed a petition in the D.C. Circuit for review of the Final Interpretation.  Invoking section 119 of the NWPA, 42 U.S.C. § 10139, which provides for court of appeals review of certain claims arising under the Act, the petitioners challenged the portion of the Final Interpretation in which DOE took the position that it did not have an unconditional statutory obligation to begin accepting nuclear waste by January 31, 1998.  They argued that DOE's legal position was contrary to the provision in section 302 of the NWPA that in return for the payment of fees, "the Secretary, beginning not later than January 31, 1998, will dispose of the high-

level radioactive waste or spent nuclear fuel involved as provided in this subchapter." 42 U.S.C. § 10222(a)(5)(B).

The D.C. Circuit reviewed the Final Interpretation to determine whether it constituted a permissible interpretation of the statute by DOE. After analyzing the statute and the Final Interpretation, the court concluded that DOE's interpretation was contrary to the statutory mandate, and the court therefore rejected DOE's interpretation. Ind. Mich. Power Co. v. Dep't of Energy, 88 F.3d 1272 (D.C. Cir. 1996).

The court interpreted section 302 of the NWPA as imposing on DOE an unconditional obligation to accept nuclear waste upon the payment of fees by the utilities. In particular, the court explained that nothing in the statute suggested that the obligation to accept nuclear waste was conditioned on the commencement of repository operations. Under the "plain language of the statute," the court held, the utilities undertook to pay fees "'in return for [which] the Secretary' had a commensurate duty" to begin disposing of the spent nuclear fuel and high-level radioactive waste by a date certain. 88 F.3d at 1276. While acknowledging that Congress had expected that a permanent facility would be available by 1998, the court ruled that even though Congress anticipated that a facility would be available, that "does not mean that Congress conditioned DOE's obligation to begin acceptance of [nuclear waste] on the availability of a facility." Id. at 1277. The court thus concluded that section 302(a)(5)(B) "creates an obligation in DOE, reciprocal to the utilities' obligation to pay, to start disposing of [nuclear waste] no later than January 31, 1998." Id.

Notwithstanding the court's ruling, DOE subsequently advised the utilities with which it had section 302 contracts that it would not begin accepting nuclear waste by

the 1998 statutory deadline. The utilities then returned to the court of appeals seeking a writ of mandamus to force DOE to comply with its statutory obligations as previously announced by the court. While that action was pending in the court of appeals, DOE asserted that under the "Unavoidable Delays" clause in the Standard Contract, 10 C.F.R. § 961.11, Art. IX(A), it was not obligated to provide a financial remedy for the delay in accepting the nuclear waste.

The court of appeals denied the utilities' request for a writ of mandamus requiring DOE to begin accepting nuclear waste as of the statutory deadline. N. States Power Co. v. U.S. Dep't of Energy, 128 F.3d 754 (D.C. Cir. 1997). The court acknowledged that "DOE's current approach toward contractual remedies is inconsistent with the NWPA" and with the court's prior decision on the matter. Id. at 756. Nonetheless, the court held that ordering DOE to comply with its statutory obligations was unnecessary because the Standard Contract "provides a potentially adequate remedy if DOE fails to fulfill its obligations by the deadline." Id. at 756. The court explained that the unconditional statutory duty to begin accepting nuclear waste as of January 31, 1998, left "no room for DOE to argue that it does not have a clear duty to take the [nuclear waste] from the owners and generators by the deadline imposed by Congress." Id. at 758-59. Moreover, the court held that there was no reason to believe that the expenses the utilities incurred in dealing with the nuclear waste that DOE failed to remove would not be taken into account "if the contractual processes operate as Congress intended." Id. at 759.

Although the court of appeals declined to order DOE to begin accepting nuclear waste as of 1998, it entered a more limited mandamus order. Holding that the NWPA

"imposes an unconditional obligation" to begin accepting nuclear waste by January 31, 1998, the court issued a writ of mandamus "precluding DOE from excusing its own delay on the grounds that it has not yet prepared a permanent repository or interim storage facility." Northern States, 128 F.3d at 761. The court held that in light of DOE's unconditional duty under the statute, the petitioners' ability to enforce the contract "would be frustrated if DOE were allowed to operate under a construction of the contract inconsistent with our prior conclusion that the NWPA imposes an obligation on DOE 'without qualification or condition.'" Id. at 759.

In particular, the court of appeals rejected DOE's argument that it was not obligated to accept nuclear waste because its failure to do so was "unavoidable" within the meaning of the "Unavoidable Delays" clause in Article IX of the Standard Contract. 128 F.3d at 757. The court held that DOE's contention that its delayed performance was excusable because it did not have a permanent repository, or congressional authority to provide storage in an interim facility, was "simply recycling the arguments rejected by this court in Indiana Michigan." Id. at 759-60. The court therefore ordered DOE "to proceed with contractual remedies in a manner consistent with NWPA's command that it undertake an unconditional obligation to begin disposal of the [nuclear waste] by January 31, 1998." Id. at 760.

DOE petitioned for rehearing, arguing that the court's mandamus order had improperly intruded upon the jurisdiction of the Court of Federal Claims with regard to claims arising under government contracts. In response to the rehearing petition, the court issued a supplemental opinion in which it clarified the scope of its order. N. States Power Co. v. Dep't of Energy, No. 97-1064, 1998 WL 276581 (D.C. Cir. May 5, 1998).

The court explained that it had barred DOE from interpreting the Standard Contract "as imposing only a contingent disposal obligation; such an interpretation, we ruled, would place the DOE in violation of its statutory duties . . . which required it to undertake an unconditional obligation." Id. at *1. Beyond that clarification of the statute's requirements, the court "remitted the utilities to their remedies under the Standard Contract." Id. at *2. The statutory duty to include such an unconditional obligation in the contract, the court added, "is independent of any rights under the contract." Id. DOE petitioned for a writ of certiorari, which was denied. Dep't of Energy v. N. States Power Co., 525 U.S. 1016 (1998).

D

In its complaint in the Court of Federal Claims, NPPD sought damages for breach of contract on account of DOE's failure to accept nuclear waste as of January 31, 1998, and thereafter. The government proposed to defend in part on the ground that its failure to meet the 1998 deadline was excused under the "Unavoidable Delays" clause of the contract. NPPD sought to bar the government from asserting that defense on the ground that it conflicted with the D.C. Circuit's mandamus order. The government responded that the D.C. Circuit lacked jurisdiction to enter the mandamus order and that the order was therefore void.

The Court of Federal Claims agreed with the government and held that the D.C. Circuit lacked jurisdiction to issue the mandamus order based on the absence of an applicable waiver of sovereign immunity. The court therefore ruled that the order was void and had no effect on the litigation over the contract. The court then certified that order for interlocutory review by this court, and this court granted interlocutory review.

Following briefing and argument before a panel of this court, we granted rehearing en banc before judgment by the panel. We now reverse.

II

The issue in this case is whether the D.C. Circuit's decisions in Indiana Michigan and Northern States are entitled to res judicata effect in the proceedings before the Court of Federal Claims. Normally, a final judgment in one court is binding on the same parties in a subsequent action before another court as a matter of res judicata; in such a setting the first judgment ordinarily cannot be collaterally challenged in the second proceeding, even on the ground that the first tribunal lacked subject matter jurisdiction. See Christopher Village, L.P. v. United States, 360 F.3d 1319, 1329-30 (Fed. Cir. 2004). However, we have recognized an exception to that principle if the first court acted in derogation of principles of sovereign immunity and its judgment was void on that ground. Id. at 1333. The Court of Federal Claims ruled that the D.C. Circuit's mandamus order was void because it was not supported by a waiver of sovereign immunity.

The trial court based its decision on three grounds. First, the court held that section 119 of the NWPA, 42 U.S.C. § 10139, did not give the D.C. Circuit jurisdiction to review DOE's Final Interpretation for inconsistency with section 302 of the Act. In that respect, the court disagreed with a series of decisions of the D.C. Circuit beginning with that court's decision in General Electric Uranium Management Corp. v. United States Department of Energy, 764 F.2d 896 (D.C. Cir. 1985) (General Electric).

Second, the court held that there was no valid waiver of sovereign immunity for the review action undertaken and the mandamus order entered by the D.C. Circuit in

the Indiana Michigan and Northern States cases, respectively. The court ruled that the only possible source of a waiver of sovereign immunity enabling the D.C. Circuit to act in those cases would be section 10(a) of the Administrative Procedure Act ("APA"), 5 U.S.C. § 702. However, the court held that section 10(a) did not waive sovereign immunity for the review proceedings in the D.C. Circuit because the plaintiffs did not satisfy the requirement in section 10(c) of the APA, 5 U.S.C. § 704, that there be "no other adequate remedy in a court" before an APA judicial review action can be brought. The court held that an action before the Court of Federal Claims for contract breach would provide an adequate remedy for the injury asserted by the utilities in the litigation before the D.C. Circuit. For that reason, the court held that the "no adequate remedy" requirement of section 10(c) was not satisfied, and that section 10(a) therefore did not effect the required waiver of sovereign immunity. Absent a waiver of sovereign immunity, the court held, the D.C. Circuit did not have jurisdiction over the utilities' action in the Indiana Michigan case, and it did not have jurisdiction to issue the mandamus order that it issued in the Northern States case.

Third, and relatedly, the trial court held that the D.C. Circuit had improperly addressed contract interpretation issues that were within the exclusive jurisdiction of the Court of Federal Claims. The court viewed the dispute before the D.C. Circuit as "entirely contained within the terms of the contract" between DOE and the utilities. While acknowledging that the Standard Contract had to be construed in light of the NWPA, the court held that the effect of the NWPA on DOE's obligations under the contract was a contract interpretation issue that fell outside the jurisdiction of the D.C. Circuit.

For the reasons set out in detail below, we disagree with each of the trial court's reasons for concluding that the D.C. Circuit's mandamus order is void. First, based on the analysis of the D.C. Circuit in General Electric and the decision of this court in PSEG Nuclear, L.L.C. v. United States, 465 F.3d 1343 (Fed. Cir. 2006), we hold that section 119 of the NWPA authorized the D.C. Circuit to review the utilities' statutory claim arising under section 302 of the Act. Second, we hold that the "no adequate remedy" requirement in section 10(c) of the APA does not apply to special statutory review provisions such as section 119 of the NWPA. Section 10(c) of the APA therefore did not bar the D.C. Circuit from exercising its jurisdiction to determine the scope of the government's obligations under section 302 of the NWPA and to order appropriate relief to enforce those obligations. Finally, we hold that the D.C. Circuit's decision construing section 302 of the NWPA, and its order directing the government to act in accordance with the utilities' rights under that provision, did not improperly intrude on the jurisdiction of the Court of Federal Claims to address NPPD's breach of contract claim. The D.C. Circuit's order prohibited the government from using contract interpretation as a means of avoiding its statutory obligations under section 302, which the D.C. Circuit was authorized to do as a means of enforcing the statutory claim that was brought before it in the Indiana Michigan case. Beyond that implementation of its statutory ruling, the D.C. Circuit properly left all issues of contract breach, enforcement, and remedy to be determined in the litigation before the Court of Federal Claims.

A

Section 119(a)(1)(A) of the NWPA, 42 U.S.C. § 10139(a)(1)(A), provides that the courts of appeals shall have original and exclusive jurisdiction over any civil action "for

review of any final decision or action of the Secretary, the President, or the [Nuclear Regulatory] Commission under this part." The term "this part" refers to part A of subchapter I of the NWPA, which is entitled "Repositories for Disposal of High-Level Radioactive Waste and Spent Nuclear Fuel." Subchapter II of the Act deals with research and development relating to the disposal of high-level radioactive waste and spent nuclear fuel. Subchapter III contains "Other Provisions Relating to Radioactive Waste," including section 302(a)(5) of the Act, 42 U.S.C. § 10222(a)(5), which designates those provisions that must be included in nuclear waste disposal contracts entered into by DOE and nuclear power providers. The Court of Federal Claims held that the D.C. Circuit lacked jurisdiction to review the Final Interpretation because the challenge to the Final Interpretation arose under section 302(a)(5), which is found in Subchapter III of the Act, not in Part A of Subchapter I.

In General Electric, the D.C. Circuit rejected the argument that section 119 applies only to actions arising from Part A of Subchapter I of the NWPA. 764 F.2d at 901-04. The court first noted that section 119 provides for review of matters such as the choice, characterization, approval of, and authorization for construction of disposal sites, and that section 221 of the Act, 42 U.S.C. § 10201, applies the judicial review provisions of section 119 to Subchapter II of the Act. In light of the broad scope of the review provisions, the court concluded that it would be "inconceivable that Congress intended to have review of all actions concerning waste disposal in the court of appeals . . . except for questions concerning the composition of the Nuclear Waste Fund and a few other matters located in Subchapter III." 764 F.2d at 901-02.

The matters addressed in Subchapter III are closely related to those addressed in Part A of Subchapter I. Thus, section 111(b) of the NWPA, 42 U.S.C. § 10131(b), which is in Part A of Subchapter I, states that the purposes of Part A include establishing a schedule for the construction and operation of repositories, establishing federal responsibility for nuclear waste disposal, and creating a Nuclear Waste Fund to ensure that the costs of disposal are borne by the persons responsible for creating the nuclear waste. Section 302 fills in the details for creating and operating the Nuclear Waste Fund established in section 111(b). Thus, while the civil action before the D.C. Circuit addressed DOE's specific responsibilities under section 302, the action could also be regarded as arising under section 111(b). See Natural Res. Def. Council, Inc. v. Abraham, 244 F.3d 742, 747 (9th Cir. 2001) (section 119 grants jurisdiction to review decisions "under the [NWPA] when the decision is pursuant to a part of the Act and relates to the purposes of the part in which the judicial review provision is placed").

In addition, as the D.C. Circuit observed in General Electric, "the evolution of the placement of section 302 in the [NWPA] strongly suggests that its physical separation from the judicial review provision in section 119 is pure happenstance and in no way indicates a congressional intent that review under the different subchapters be governed by different standards." 764 F.2d at 903. A close examination of the legislative history of the NWPA provides strong support for that conclusion.

The principal bill on which the NWPA was based, H.R. 3809 (1982), contained a judicial review provision similar to the enacted version of section 119. See H.R. Rep. No. 97-491, pt. I, at 14, 56-57 (1982) (section 119). That bill also contained a substantive provision corresponding to section 302 of the enacted statute. See id. at

15-16, 58-59 (section 124(a)(4)(B)). A second House bill, H.R. 6598 (1982), produced by a different committee, also had a judicial review provision corresponding to section 119 and a substantive provision equivalent to section 302. See H.R. Rep. No. 97-785, pt. I, at 16-17, 18-19 (1982). Significantly, in both of those predecessor bills the section that became section 302 of the NWPA was located in subtitle A of Title I, thus clearly providing court of appeals review for issues arising under that section. When the House bills were reconciled on the floor of the House, the predecessor provision to section 302 was moved to Title III of the Act, but no change was made in section 119, the judicial review provision. See 128 Cong. Rec. 26,305, 26,306-42 (1982). While there was no explanation for moving section 302 out of Title I, there was no suggestion that Congress intended, as part of the process of reconciling the House bills, to withdraw court of appeals review with respect to matters arising under section 302 that had been covered in both of the predecessor bills.[1] The Senate adopted the House bill in substance without material change to sections 119 and 302.

Even if the statute is regarded as ambiguous as to whether section 119 places review of matters arising from section 302 in a court of appeals, or leaves such matters to district courts under the default judicial review provision of section 10(c) of the APA, 5 U.S.C. § 704, any such ambiguity must be resolved in favor of court of appeals review.

---

[1] The third of the three House predecessor bills, H.R. 5016 (1981), contained no provision equivalent to section 302, but it contained a judicial review provision that provided court of appeals review for all matters arising under the Act. See Nuclear Waste Disposal Policy, Hearings on H.R. 1993, H.R. 2881, H.R. 3809, and H.R. 5016 Before the Subcomm. on Energy Conservation and Power of the H. Comm. on Energy & Commerce, 97th Cong. 2d Sess. 209-10 (1982). Accordingly, nothing in that bill suggests any reason that the House, in the course of reconciling the predecessor bills, would have intended to restrict court of appeals review of matters arising under the provision that ultimately became section 302.

When there is a question whether judicial review was meant to be in district courts or courts of appeals, that ambiguity is resolved in favor of court of appeals review. General Electric, 764 F.2d at 903; see generally Clark v. Commodity Futures Trading Comm'n, 170 F.3d 110, 114 (2d Cir. 1999); Tennessee v. Herrington, 806 F.2d 642, 650 (6th Cir. 1986); Suburban O'Hare Comm'n v. Dole, 787 F.2d 186, 192-93 (7th Cir. 1986). Because review in a district court would be subject to the appellate jurisdiction of the court of appeals in any event, resolving jurisdictional ambiguity in favor of direct review in the court of appeals "avoids duplicative review and the attendant delay and expense involved." General Electric, 764 F.2d at 903; see also Harrison v. PPG Indus., Inc., 446 U.S. 578, 593 (1980); Natural Res. Def. Council v. Abraham, 355 F.3d 179, 193-94 (2d Cir. 2004); Ind. & Mich. Elec. Co. v. U.S. Envtl. Prot. Agency, 733 F.2d 489, 491 (7th Cir. 1984). That is particularly true in the case of a review proceeding involving a pure legal issue, such as the review of DOE's Final Interpretation for consistency with section 302 of the NWPA. In that context, as the General Electric court concluded, "we cannot assume that Congress intended both the District Court and this court to perform the identical review function" of reviewing DOE's interpretation of the NWPA. 764 F.2d at 904.

In the aftermath of the General Electric decision, other circuits likewise rejected the argument that section 119 applies only to matters arising under Part A of Subchapter I of the NWPA. See Ala. Power Co. v. U.S. Dep't of Energy, 307 F.3d 1300, 1312-13 (11th Cir. 2002); County of Esmeralda v. U.S. Dep't of Energy, 925 F.2d

1216, 1218-19 (9th Cir. 1991); Tennessee v. Herrington, 806 F.2d at 647-51. No circuit court has taken the opposite position.[2]

More recently, in the PSEG case, this court agreed with General Electric and the other circuit decisions holding that the reviewing authority conferred by section 119 of the NWPA is not limited to matters arising under Part A of Subchapter I of the Act. See 465 F.3d at 1349 ("We agree with . . . the D.C. Circuit that agency actions mandated under [Subchapter] III which relate to the creation of repositories for spent nuclear fuel fall within the class of actions subject to review by the courts of appeals under section 119."). The court further held that the January 31, 1998, deadline for beginning nuclear waste collection "was clearly statutorily mandated" by section 302 of the NWPA, and it recognized that judicial review under section 119 of the NWPA "as to whether the DOE properly incorporated these obligations within its contracts may fall within the jurisdiction conferred to the courts of appeals in section 119." Id. at 1350.

---

[2]    The Court of Federal Claims interpreted several circuit court decisions as rejecting the General Electric court's interpretation of section 119, but we do not read those decisions in that manner. The Ninth Circuit in Natural Resources Defense Council, Inc. v. Abraham, 244 F.3d 742 (9th Cir. 2001), did not reject the analysis in General Electric, but held that "NWPA's provision for judicial review is limited to decisions 'under' the part or at least under the Act when the decision is pursuant to a part of the Act and relates to the purposes of the part in which the judicial review provision is placed." Id. at 747 (emphases in original). In both General Electric and Indiana Michigan, as we discussed above, the agency action at issue "relates to the purposes" of subchapter I, part A, of the Act. In Nevada v. Herrington, 827 F.2d 1394, 1399-1400 (9th Cir. 1987), the court did not address whether section 119 applies to activities arising under section 302. Public Citizen v. Nuclear Regulatory Commission, 845 F.2d 1105, 1106 (D.C. Cir. 1988), is inapposite. In that case, the D.C. Circuit stated that it was not necessary to decide whether the rationale of General Electric applied to a proceeding to review a claim arising under section 306 of the Act; nothing in the court's opinion in that case reflects a repudiation of the court's earlier decision in General Electric.

The court in PSEG held that section 119 does not have the effect of transferring all contract breach issues to the courts of appeals. As the court explained, "issues of whether the DOE breached its contractual obligations, and if so, to what damages, if any, PSEG is entitled for the breach" did not arise under the NWPA, but were for the Court of Federal Claims to address. PSEG, 465 F.3d at 1350. That was because those issues are "not within the DOE's statutory obligations under the NWPA." Id. However, with respect to claims arising from the statutory mandates in section 302, PSEG supports NPPD's position that courts of appeals have jurisdiction to review such claims pursuant to section 119 of the Act.

The government makes the further argument that even if, as PSEG held, section 119 applies to at least some issues arising under section 302, section 119 review is limited to actions relating to the creation of nuclear waste repositories. Because the government characterizes this case as involving the date for accepting nuclear waste, but not "the development of or date for opening a repository," the government argues that section 119 does not vest judicial review jurisdiction in the courts of appeals. The government notes that subparagraph (A) of section 302(a)(5) refers to the commencement of repository operations and DOE's responsibility to take title to nuclear waste, but does not refer to the date the repository operations are to begin, while subparagraph (B) of section 302(a)(5) identifies the date by which disposal must begin, but does not mention a repository. Accordingly, the government contends that even if issues arising under section 302(a)(5)(A) of the NWPA are subject to review in a court of appeals, issues arising under section 302(a)(5)(B) are subject to review, if at all, only in a district court under the default review provisions of the APA.

The government's argument is not based on the statutory text, the legislative history, or any discernible policy, but instead appears tailored simply to accommodate the specific holding of PSEG while still maintaining that section 119 did not provide the D.C. Circuit with jurisdiction to review DOE's Final Interpretation in the Indiana Michigan case. The divided review regime contemplated by the government's argument would be exceptionally cumbersome, and it is difficult to think of any reason why Congress would have wanted to create such a scheme. We reject the government's proffered distinction of PSEG and hold that the D.C. Circuit did not lack jurisdiction to review the consistency of DOE's Final Interpretation with section 302 of the NWPA based on the purported inapplicability of section 119 of the Act.[3]

B

Apart from ruling that section 119 of the NWPA did not authorize court of appeals review of a claim arising under section 302, the trial court held that the D.C. Circuit lacked jurisdiction to review the Final Interpretation because there was no statutory

---

[3] The government argues that the utilities' action in the D.C. Circuit was barred by the 180-day statute of limitations in section 119(c), 42 U.S.C. § 10139(c), and that the D.C. Circuit's order should not be given res judicata effect in the present proceedings for that reason as well. Setting aside whether the statute of limitations for a judicial review proceeding under section 119(c) is jurisdictional in nature, there is no merit to the government's argument. In 1983, the utilities had no reason to believe DOE would interpret the Standard Contract as it did in the Final Interpretation, because at that time DOE assured the utilities that it regarded itself as bound by the 1998 deadline. In 1994, when DOE announced its preliminary view that the NWPA did not require it to begin accepting nuclear waste in 1998 if it did not have a facility ready at that time, the utilities immediately sought judicial review. However, the D.C. Circuit dismissed the petition for review on the ground that it was premature. N. States Power Co. v. Dep't of Energy, Nos. 94-1457 & 95-1321 (D.C. Cir. July 28, 1995). Only with the promulgation of the Final Interpretation did DOE's position with regard to its statutory responsibilities become sufficiently clear and final for judicial review. The petition was filed within 180 days of the issuance of the Final Interpretation and was thus timely.

waiver of sovereign immunity for that review proceeding. Accordingly, the trial court concluded that the D.C. Circuit's mandamus order was void on that ground as well.

Section 10(a) of the APA is the source typically invoked for waiver of sovereign immunity in a case involving judicial review of administrative action by federal agencies or officials. It provides, in pertinent part, that an action seeking relief other than money damages and stating a claim challenging an action by an agency or officer of the United States "shall not be dismissed nor relief therein be denied on the ground that it is against the United States." 5 U.S.C. § 702. The Court of Federal Claims held that section 10(a) did not waive sovereign immunity with respect to the review conducted by the D.C. Circuit in the Indiana Michigan and Northern States cases because section 10(c) of the APA, 5 U.S.C. § 704, requires that there be "no other adequate remedy in a court." The court explained that an adequate remedy was available through an action for breach of contract in the Court of Federal Claims, and it was therefore improper for the D.C. Circuit to conduct judicial review of DOE's Final Interpretation. See 73 Fed. Cl. at 672-73 ("[B]ecause an adequate remedy was and is available in this court, section 704 precluded the D.C. Circuit in Indiana Michigan from relying on the section 702 waiver in issuing the judgment that, in turn, led it to issue in Northern States the mandamus at issue.").

We disagree with the trial court's interpretation of section 10(c) of the APA. That statute provides, in pertinent part: "Agency action made reviewable by statute and final agency action for which there is no other adequate remedy in a court are subject to judicial review." 5 U.S.C. § 704. The most natural reading of that sentence is that it relates to two categories of agency action: agency action that is made reviewable by a

specific review-authorizing statute, such as section 119 of the NWPA (referred to as "special statutory review"), and final agency action for which there is no adequate remedy at law (referred to as "nonstatutory review" or, sometimes, "general statutory review"). Under that reading, the "adequate remedy at law" proviso applies only to nonstatutory review and not to special statutory review, such as the review at issue in this case. For that reason, even if the plaintiffs would have been entitled, in a contract breach action in the Court of Federal Claims, to invoke section 302 of the NWPA to overcome DOE's reliance on the "Unavoidable Delays" clause, the fact that they could have invoked section 302 in the contract breach litigation would not bar them from seeking relief in a statutory APA review proceeding.

Although the statutory language can be interpreted, with some effort, to apply the "adequate remedy" proviso to both statutory and nonstatutory review, the courts have not interpreted section 10(c) in that manner. In Abbott Laboratories v. Gardner, 387 U.S. 136 (1967), the Supreme Court characterized section 10(c) of the APA as providing "specifically not only for review of '[a]gency action made reviewable by statute' but also for review of 'final agency action for which there is no other adequate remedy in a court.'" Id. at 140; see also Bowen v. Massachusetts, 487 U.S. 879, 904 (1988) (quoting the pertinent language in Abbott Laboratories approvingly); id. at 926 & n.4 (Scalia, J., dissenting) (distinguishing between agency action specifically made reviewable by another statute and nonstatutory review in which review of final agency action is permitted under the APA if there is no "other adequate remedy").[4]

---

[4] The legislative history of the APA underscores the point. As originally enacted, the pertinent language of section 10(c) read as follows: "Every agency action

This court and others have characterized section 10(c) in the same way.  On several occasions, we have noted that the "no other adequate remedy in a court" formulation is associated with "nonstatutory review."  See Doe v. United States, 372 F.3d 1308, 1312 (Fed. Cir. 2004) (stating that in a "nonstatutory review action" there must be "no other adequate remedy in a court"); Brazos Elec. Power Coop., Inc. v. United States, 144 F.3d 784, 786 (Fed. Cir. 1998) (same); Nat'l Ctr. for Mfg. Scis. v. United States, 114 F.3d 196, 200 (Fed. Cir. 1997) (same).  Other circuits have uniformly characterized section 10(c) in the same fashion.[5]  We concur with those characterizations and accord section 10(c) its natural meaning, under which the "no

made reviewable by statute and every final agency action for which there is no other adequate remedy in any court shall be subject to judicial review."  Pub. L. No. 404, § 10(c), 60 Stat. 237, 243 (1946).  That formulation makes it inescapably clear that the "no other adequate remedy" proviso does not apply to "agency action made reviewable by statute."  The language of section 10(c) was changed to the present form when Title 5 of the U.S. Code was recodified in 1966, Pub. L. No. 89-554, 80 Stat. 378, 392-93 (1966), but the accompanying revision notes explain that no substantive change was intended.  See 5 U.S.C. p. 766 (2006 ed.) (Historical and Revision Notes).

[5]  See, e.g., Turner v. Sec'y of the U.S. Dep't of Housing & Urban Dev., 449 F.3d 536, 539 (3d Cir. 2006) (agency actions are reviewable if they are "made reviewable by statute" or if there was a "final agency action for which there is no other adequate remedy in a court"); Pennaco Energy, Inc. v. U.S. Dep't of the Interior, 377 F.3d 1147, 1155 (10th Cir. 2004) (agency action is subject to judicial review "when it is either: (1) 'made reviewable by statute,' or (2) a 'final agency action for which there is no other adequate remedy in a court'"); Air Brake Sys., Inc. v. Mineta, 357 F.3d 632, 638 (6th Cir. 2004) (federal courts may review two types of agency actions: "[1] Agency action made reviewable by statute and [2] final agency action for which there is no other adequate remedy in a court"); Niagara Mohawk Power Corp. v. FERC, 306 F.3d 1264, 1268 (2d Cir. 2002) ("Niagara must show that either (1) the FERC action of which Niagara seeks judicial review is 'made reviewable by statute' or (2) 'there is no other adequate remedy in a court.'"); Carter/Mondale Presidential Comm., Inc. v. Fed. Election Comm'n, 711 F.2d 279, 284 n.9 (D.C. Cir. 1983) (section 704 "makes judicial review available for two categories of agency action: '[a]gency action made reviewable by statute' and 'final agency action for which there is no other adequate remedy in a court'").

adequate remedy" requirement does not apply to special statutory review provisions such as section 119.

Consideration of Congress's objectives in enacting section 10(a) shows why this construction makes sense. Congress was, of course, aware of the pre-existing statutes that provided for special review of particular agency action, including review in the courts of appeals for actions of agencies such as the Interstate Commerce Commission, the National Labor Relations Board, and the Federal Trade Commission. See Bowen, 487 U.S. at 903. It was to fill in the gaps in that patchwork of special review provisions that Congress created the right to general review of agency action in the district courts through section 10(a). Congress provided that the new default review created by section 10(a) would not be available if there were already an adequate remedy available in a court, because it "did not intend that general grant of jurisdiction to duplicate the previously established special statutory procedures relating to specific agencies." Id. By the same token, however, Congress plainly did not intend section 10(a) to narrow the scope of the pre-existing special statutory review provisions, which would be the effect if the "no adequate remedy" requirement were deemed applicable to those provisions. Accordingly, we reject the rationale of the Court of Federal Claims to the extent that it relies on the "no other adequate remedy in a court" provision of section 10(c) to hold that the D.C. Circuit was foreclosed from conducting the review proceeding in this case.[6]

---

[6] Because we hold that section 10(a) of the APA waives sovereign immunity for a judicial review action under section 119 of the NWPA, we need not decide whether, as NPPD argues, section 119 itself waives sovereign immunity for such an action.

The Court of Federal Claims relied heavily on this court's decision in Christopher Village, L.P. v. United States, 360 F.3d 1319 (Fed. Cir. 2004), in support of its decision. In that case, the Fifth Circuit directed the issuance of a declaratory judgment in favor of government contractors that had filed a nonstatutory APA action in district court. We held that the Fifth Circuit's order was void because the contractors had an adequate remedy in a court of law, namely, an action in the Court of Federal Claims for breach of contract. Significantly, the judicial review at issue in that case was nonstatutory review, not review pursuant to a special statutory review provision permitting review in a regional court of appeals, such as section 119 of the NWPA. The court's analysis in Christopher Village with respect to the "no other adequate remedy" clause of section 10(c) of the APA is therefore inapplicable here. That is also true of another case the trial court cited, Consolidated Edison Co. v. United States, 247 F.3d 1378 (Fed. Cir. 2001), which similarly relied on the "no other adequate remedy" clause in section 10(c) in a nonstatutory review case. Because the availability of review under section 119 of the NWPA obviates the need to inquire into the availability of other possible judicial remedies, section 10(c) of the APA is not an impediment to court of appeals review in this case. Accordingly, we hold that section 10(a) of the APA waived sovereign immunity for the judicial review of DOE's Final Interpretation by the D.C. Circuit .[7]

---

[7] The government also argues that the D.C. Circuit's mandamus order is barred by sovereign immunity because the judicial review action in the D.C. Circuit was not one "seeking relief other than money damages," as required by section 10(a) of the APA. We reject that argument. In their mandamus petition in the D.C. Circuit, the utilities sought an order requiring DOE to accept their nuclear waste, and thus were not requesting money damages. The court denied the requested relief, but substituted an order barring DOE from acting in derogation of its statutory obligation under section

C

In addition to holding that Congress did not waive sovereign immunity for the D.C. Circuit's review proceeding in <u>Indiana Michigan</u>, the Court of Federal Claims focused in particular on the mandamus order and held that the order "pretermits a key aspect of the contractual dispute before this court," 73 Fed. Cl. at 662, and in so doing "plainly encroaches upon this court's jurisdiction." <u>Id.</u> at 663.

In assessing whether the D.C. Circuit's mandamus order improperly invaded the jurisdiction of the Court of Federal Claims over the adjudication of contract rights, it is important to focus on precisely what agency action was challenged in the D.C. Circuit and what relief the D.C. Circuit granted. The issue before the D.C. Circuit in <u>Indiana Michigan</u> was whether section 302(a)(5)(B) of the NWPA imposed an unconditional obligation on DOE to accept nuclear waste by the statutory deadline. The agency action challenged in that case was DOE's announcement in the Final Interpretation that it had no statutory obligation to accept nuclear waste by 1998 if DOE did not have an appropriate storage facility at that time. The D.C. Circuit rejected that argument as clearly contrary to the NWPA.

The issue before the D.C. Circuit in <u>Northern States</u> was what relief was appropriate in light of what the court characterized as DOE's effort to circumvent the

---

302(a)(5)(B). Neither the relief sought, nor the relief granted, was for money damages. The fact that the relief granted could affect subsequent contract litigation that in turn could result in an award of damages does not convert the mandamus order into an award of damages. See <u>Katz v. Cisneros</u>, 16 F.3d 1204, 1209 (Fed. Cir. 1994) (upholding district court jurisdiction to review a regulation even though "once the propriety of [the agency's] interpretation of the regulation has been adjudicated, it will act accordingly, and any monetary consequences will flow through the contractual scheme").

court's statutory ruling by arguing that the Standard Contract relieved it of the responsibility to accept nuclear waste if it lacked a facility for accepting the waste. The D.C. Circuit determined that DOE's interpretation of the Standard Contract would allow DOE to treat its obligation to accept nuclear waste as a contingent obligation, in violation of the unconditional statutory obligation announced by the court in Indiana Michigan. Viewing DOE's position as simply "recycling the arguments" that the court had rejected in Indiana Michigan, the court issued an order "precluding DOE from excusing its own delay on the grounds that it has not yet prepared a permanent repository or interim storage facility." Northern States, 128 F.3d at 761.

The D.C. Circuit concluded that it was necessary to bar DOE from doing under the rubric of contract interpretation what section 302(a)(5)(B) prohibited as a matter of statutory compulsion. Beyond that, however, the court stated that the utilities would be required to seek relief for any asserted breach of contract in an action before the Court of Federal Claims. On rehearing, in response to DOE's argument that the court had erroneously "designated itself as the proper forum for adjudication of disputes arising under the Standard Contract," the D.C. Circuit stated, "[W]e did not; we merely prohibited the DOE from implementing an interpretation that would place it in violation of its duty under the NWPA to assume an unconditional obligation to begin disposal by January 31, 1998. The statutory duty . . . is independent of any rights under the contract." N. States Power Co. v. Dep't of Energy, No. 97-1064, 1998 WL 276581 (D.C. Cir. May 5, 1998), at *2. The court added that its initial decision in Northern States described "the nature of the DOE's obligation, which was created by the NWPA and undertaken by the DOE under the Standard Contract. It does not place the question of

contract remedies in this court, nor set up this court as a source of remedies outside the Standard Contract." Id.

A later opinion by the D.C. Circuit in a different case sheds further light on what that court regarded as the proper scope of its reviewing authority with respect to the NWPA and the Standard Contract. In Wisconsin Electric Power Co. v. United States Department of Energy, 211 F.3d 646 (D.C. Cir. 2000), a nuclear power producer petitioned for a writ of mandamus from the D.C. Circuit declaring that the Department of Energy must provide both monetary and non-monetary relief for having failed to begin disposing of the company's nuclear waste by January 31, 1998. The court denied the petition. The court explained that it had held in Indiana Michigan that DOE had an unconditional statutory obligation to begin disposing of nuclear waste by January 31, 1998, but that DOE had "acted to frustrate that decision by holding that its failure to perform was 'unavoidable' and therefore, under the terms of the [Standard] Contract, did not render the Department liable for damages of any kind." Id. at 647. For that reason, the court noted, it had issued a writ of mandamus "forbidding the DOE from claiming, in proceedings under its contracts, that its failure to perform was 'unavoidable' because a repository was not available." Id. The court stated that it had "expressed no opinion about the relief the DOE would have to provide for breach of that obligation," and that "[t]he Court of Federal Claims, not this court, is the proper forum for adjudicating contract disputes." Id. at 648. Thus, in Wisconsin Electric, as in Northern States, the D.C. Circuit characterized its authority as limited to prohibiting the government from acting in derogation of its statutory obligations under the NWPA. The

court disclaimed that its authority otherwise extended to any issue of contract interpretation, enforcement, or remedies.

The trial court in this case characterized the D.C. Circuit's mandamus order as being at odds with the analysis in this court's recent decision in PSEG Nuclear, L.L.C. v. United States, 465 F.3d 1343 (Fed. Cir. 2006), but we disagree. Like this case, PSEG was a case brought by a nuclear power producer alleging a breach of contract because of DOE's failure to begin accepting nuclear waste as of January 31, 1998. In PSEG, however, the Court of Federal Claims held that it lacked jurisdiction over the plaintiff's breach of contract claim because section 119 of the NWPA gave the courts of appeals exclusive jurisdiction over all actions relating to the contract term requiring performance by January 31, 1998. On appeal, this court rejected the Court of Federal Claims' conclusion that section 119 divested it of jurisdiction over the underlying breach of contract action. We held that section 119 gave the regional courts of appeals jurisdiction to decide whether the Standard Contract complied with the requirements of section 302, but that it did not strip the Court of Federal Claims of its Tucker Act jurisdiction over the breach of contract suit. 465 F.3d at 1349-50.

In the course of its analysis, the PSEG court distinguished between "judicial review as to whether the DOE properly incorporated [its statutory] obligations within its contracts," an issue that the court said could fall within the jurisdiction of the courts of appeals under sections 119 and 302 of the NWPA, and "the performance of and any damages for failure to meet those obligations. 465 F.3d at 1350. The latter issues, the court held, "are not within the DOE's statutory obligations under the NWPA," but fall within the jurisdiction of the Court of Federal Claims. Id.

Because the issue in PSEG was whether the NWPA wholly stripped the Court of Federal Claims of its jurisdiction over PSEG's breach of contract claim, the PSEG court did not find it necessary to decide "whether the courts of appeals continue to have jurisdiction to decide the propriety of agency actions under section 302 once the government includes the required language in the Standard Contract." 465 F.3d at 1348. That unresolved question is presented in this case. Yet, while PSEG does not decide that question, it provides guidance as to the proper analytical approach for deciding it.

First, the PSEG court recognized that section 119 of the NWPA authorizes court of appeals review of DOE actions taken under section 302. Second, the court made clear that the breadth of the reviewing court's mandate under that authority depends on whether the agency action in question "involve[s] the agency's authority under that statutory mandate," that is "whether the DOE properly incorporated [the statutory] obligations within its contracts." PSEG, 465 F.3d at 1350. Finally, the court explained that answering that question does not involve the reviewing court in "issues of whether the DOE breached its contractual obligations, and if so, to what damages, if any, PSEG is entitled for the breach." Id.

That is the same line the D.C. Circuit drew in the Indiana Michigan, Northern States, and Wisconsin Electric decisions, and we reaffirm that distinction here. It was within the authority of the D.C. Circuit to say what section 302(a)(5) of the NWPA means; and, except to the extent that the D.C. Circuit's ruling on the statutory question controls as a matter of res judicata, it is within the authority of the Court of Federal Claims to interpret, apply, and enforce the provisions of the Standard Contract.

Notwithstanding the disclaimers by the D.C. Circuit, the Court of Federal Claims in this case concluded that the D.C. Circuit's mandamus order was void because that court had exceeded its jurisdiction by "enforcing the terms of the Standard Contract," a task that Congress committed to the Court of Federal Claims through the Tucker Act. 73 Fed. Cl. at 662. The trial court viewed the D.C. Circuit's mandamus order as dictating the resolution of an important dispute over contract interpretation, a dispute that the court regarded as "squarely within this court's Tucker Act jurisdiction." Id. The court added that "the fact that a contract is underlain by a statute or regulation does not turn a contract interpretation question into one involving statutory or regulatory construction to be controlled by the administrative law decisions of other courts." Id. at 664. We disagree with that analysis.

Section 302(a)(5)(B) of the NWPA directs that DOE's contracts with nuclear power producers must provide that DOE will begin disposing of nuclear waste by January 31, 1998. As a matter of statutory construction, the D.C. Circuit interpreted DOE's obligation to begin accepting nuclear waste in 1998 as unconditional. If DOE had omitted the clause required by section 302(a)(5)(B) from its contracts, it is clear that a court order directing the inclusion of that clause in its contracts would constitute a straightforward enforcement of DOE's statutory responsibilities and would not intrude on the Tucker Act jurisdiction of the Court of Federal Claims. See PSEG, 465 F.3d at 1348.

What the D.C. Circuit did in the Indiana Michigan and Northern States cases is not meaningfully different. As the D.C. Circuit viewed the matter, DOE included a provision in the Standard Contract pertaining to its obligation to begin accepting nuclear

waste by 1998, but then nullified the statutory requirement by interpreting the "Unavoidable Delays" clause to make that obligation conditional. DOE's conduct, as the D.C. Circuit viewed it, was equivalent to having omitted the clause required by section 302(a)(5)(B) from the Standard Contract in the first place. Once the D.C. Circuit construed the NWPA to require DOE to begin accepting nuclear waste by 1998, it was not a significant further step to conclude that Congress did not intend for DOE to avoid that statutory obligation by adopting a contrary interpretation of the Standard Contract. Thus, based on its interpretation of the NWPA, the D.C. Circuit held that the government's failure to have a repository ready by January 31, 1998, could not be excused as unavoidable delay.

The government argues—with a passing endorsement from the trial court, 73 Fed. Cl. at 672 n.30—that the D.C. Circuit's mandamus order fell outside the waiver of sovereign immunity in section 10(a) of the APA because it ran afoul of the proviso in that section barring review "if any other statute that grants consent to suit expressly or impliedly forbids the relief which is sought." 5 U.S.C. § 702. Citing Sharp v. Weinberger, 798 F.2d 1521 (D.C. Cir. 1986), the government contends that the D.C. Circuit's order was impliedly forbidden by the Tucker Act.

Sharp and the other cases on which the government relies stand for the proposition that "[t]he sole remedy for an alleged breach of contract by the federal government is a claim for money damages, either in the United States Claims Court under the Tucker Act or, if damages of no more than $10,000 are sought, in the district court under the Little Tucker Act." Sharp, 798 F.2d at 1523 (citations omitted). But the cases cited by the government involve actions for relief based on rights conferred by a

contract.  In <u>Sharp</u>, for example, the plaintiff sought "a declaration that he had a valid contract with appellees and an injunction requiring appellees to perform that contract." <u>Id.</u>

The D.C. Circuit subsequently explained that a case is not a "contract case" that is subject to the "impliedly forbids" limitation in section 10(a) simply because it involves contractual issues.  Instead, the question whether the Tucker Act impliedly forbids a district court from acting in a case depends on "whether, despite the presence of a contract, plaintiffs' claims are founded only on a contract, or whether they stem from a statute or the Constitution."  <u>Transohio Sav. Bank v. Dir., Office of Thrift Supervision</u>, 967 F.2d 598, 609 (D.C. Cir. 1992).  The court drew the following lesson from <u>Sharp</u>: that under section 10(a) and the Tucker Act, "litigants may bring common-law contract claims only as actions for money damages in the Claims Court, but they may bring statutory and constitutional claims for specific relief in federal district court even when the claims depend on the existence and terms of a contract with the government."  <u>Id.</u> at 610; <u>see also</u> <u>Roberts v. United States</u>, 242 F.3d 1065, 1068-69 (Fed. Cir. 2001) (quoting with approval the standard articulated in <u>Transohio</u>); <u>Katz v. Cisneros</u>, 16 F.3d 1204, 1209 (Fed. Cir. 1994) (same).

In <u>Indiana Michigan</u>, unlike in <u>Sharp</u>, the utilities sought relief based on a statute. Even though it was clear that the D.C. Circuit's remedial order would affect later litigation over contract-based rights, it remains the case that the D.C. Circuit was interpreting statutory rights, not rights under a contract.  For that reason, the D.C. Circuit's action was not impliedly forbidden by the Tucker Act.

The government's position in this case is fueled in large measure by its conviction that the D.C. Circuit was wrong when it interpreted section 302 as imposing an unconditional obligation to begin accepting nuclear waste in 1998, and its hope that the Court of Federal Claims or this court will interpret the statute differently. It is important to emphasize, however, that the merits of that issue of statutory construction are not before us. The D.C. Circuit resolved that issue, and its resolution became final when the government's petition for certiorari in the <u>Northern States</u> case was denied. The question before us is whether the D.C. Circuit had jurisdiction to decide that issue of statutory construction, or whether the doctrine of sovereign immunity barred it from reviewing the government's compliance with section 302 and enforcing its decision by prohibiting the government from taking actions inconsistent with the D.C. Circuit's interpretation of the government's statutory obligations.

The mandamus order was issued pursuant to the D.C. Circuit's authority to construe the NWPA and to direct DOE to comply with its obligations under the statute. The order did not address any issue of contract breach, direct the implementation of any remedy, or construe any contract defense, except to the extent that the proposed interpretation of the contract would conflict with the statutory directive in section 302(a)(5). Those issues are all left to the Court of Federal Claims to decide in the contract breach action before it. We are satisfied that the D.C. Circuit's order was confined to the issue of statutory interpretation and did not impermissibly invade the jurisdiction of the Court of Federal Claims to adjudicate the parties' rights and remedies under the contract between them.

In sum, the D.C. Circuit's decisions in the <u>Indiana Michigan</u> and <u>Northern States</u> cases were not barred by sovereign immunity and should not have been denied res judicata effect on that ground. We therefore reverse the order of the Court of Federal Claims under review and remand for further proceedings consistent with this opinion.

<u>REVERSED and REMANDED</u>.

# United States Court of Appeals for the Federal Circuit

2007-5083

NEBRASKA PUBLIC POWER DISTRICT,

Plaintiff- Appellant,

v.

UNITED STATES,

Defendant-Appellee.

Appeal from the United States Court of Federal Claims in 01-CV-116, Judge Francis M. Allegra.

DYK, <u>Circuit Judge</u>, with whom LINN, <u>Circuit Judge</u>, joins, concurring.

While I join the majority, I write separately to address what I view as the dissent's overreading of the majority opinion.

The court appears to be unanimous in agreeing that the District of Columbia Circuit had jurisdiction to interpret the statute, and that the D.C. Circuit did not (and could not) address purely remedial questions. I read the majority opinion here as holding that as a matter of res judicata, the D.C. Circuit's statutory interpretation bars interpreting the Unavoidable Delays clause as creating a defense to liability. However, contrary to the dissent, I do not read either the D.C. Circuit or the majority here as ordering the government to pay money damages (expectancy damages) for breach of the agreement.[1] Although I read the majority as establishing government liability, it

---

[1] <u>See</u> Dissent at 14 ("[T]he D.C. Circuit ordered what is, in effect, compensatory relief. . . . The D.C. Circuit exceeded its jurisdiction in [precluding the

remains open for the government to argue that the Unavoidable Delays clause bars a damages award (as opposed to some other contractual remedy such as restitution). Indeed, on its face the Unavoidable Delays clause appears only to deal with the availability of a particular remedy—money damages—and, of course, the D.C. Circuit has no jurisdiction to determine questions concerning damages remedies. Section 702 of the APA precludes the D.C. Circuit from making such determinations, whether in the form of a declaratory determination or mandamus. See 5 U.S.C. § 702 (waiving sovereign immunity only where the plaintiff is "seeking relief other than money damages"). As the Supreme Court noted in Great-West Life & Annuity Insurance Co. v. Knudson, 534 U.S. 204, 210 (2002), "[a]lmost invariably . . . suits seeking (whether by judgment, injunction, or declaration) to compel the defendant to pay a sum of money to the plaintiff are suits for 'money damages,' as that phrase has traditionally been applied, since they seek no more than compensation for loss resulting from the defendant's breach of legal duty." See also Consol. Edison Co. of N.Y., Inc. v. U.S., Dep't of Energy, 247 F.3d 1378, 1382–83 (Fed. Cir. 2001) ("Section 702 [of the APA], however, denies this sovereign immunity waiver to claims for money damages . . . .").

---

Department of Energy from relying on the Unavoidable Delays provision] and by its writ thus obligated the DOE to pay compensatory damages in a subsequent breach of contract action.").

# United States Court of Appeals for the Federal Circuit

2007-5083

NEBRASKA PUBLIC POWER DISTRICT,

Plaintiff-Appellant,

v.

UNITED STATES,

Defendant-Appellee.

Appeal from the United States Court of Federal Claims in 01-CV-116, Judge Francis M. Allegra.

GAJARSA, <u>Circuit Judge</u>, dissenting.

The issue before the court is a fundamental question of jurisdiction between this court and the D.C. Circuit. If the order in mandamus issued by the D.C. Circuit had interpreted the statutory requirements of the Nuclear Waste Policy Act (NWPA), then it would have been within that court's jurisdiction. Instead, the D.C. Circuit actually forbids the United States from defending itself in a contract action in the Court of Federal Claims. In my judgment, the order in mandamus is clearly directed to the interpretation of the Standard Contract (not the NWPA) and is thus not only outside the jurisdiction of the D.C. Circuit, but also infringes upon the Court of Federal Claims's exclusive Tucker Act jurisdiction over the administration of contract disputes, thereby impacting the sovereign immunity of the United States and undermining this court's duty to review the contract decisions of the Court of Federal Claims. I must therefore dissent from the majority's judgment.

I.

As an initial matter, I am compelled to highlight the procedural posture of this case. Nebraska Public Power District appeals an interlocutory decision of the Court of Federal Claims (the "trial court"), Nebraska Public Power District v. United States, 73 Fed. Cl. 650 (2006), that sustained the United States' collateral attack on the D.C. Circuit's decisions in Indiana Michigan Power Company v. Department of Energy ("Indiana Michigan Power"), 88 F.3d 1272 (D.C. Cir. 1996), and Northern States Power Company v Department of Energy ("Northern States I"), 128 F.3d 754 (D.C. Cir. 1997). The trial court certified its decision for immediate review by this court, and we accepted the appeal.

The appeal was argued before a panel of this court. Thereafter, a poll of the judges in regular active service was conducted to determine whether the appeal should be heard en banc. An en banc hearing was subsequently granted. The en banc court requested supplemental briefing relating to the interpretation and preclusive effects of the D.C. Circuit's Northern States I decision and heard further argument.

At no time during this process has the trial court issued any decision on the merits of this case. Accordingly, this court's review is limited solely to the trial court's decision before us on interlocutory appeal. The question presented is simple: whether the D.C. Circuit's order in mandamus in Northern States I precludes the Department of Energy ("DOE") from relying on a clause of the Standard Contract—the Unavoidable Delays clause—in a breach of contract action brought by several nuclear power companies in the Court of Federal Claims. Importantly, it is not for this court to determine in the first instance whether the DOE should be estopped from relying on the

2

2007-5083

Unavoidable Delays clause or what impact the Unavoidable Delays clause may have on the availability of various contract remedies in light of the DOE's ongoing failure to accept Spent Nuclear Fuel ("SNF").

II.

Turning, then, to the limited question at hand, it is undisputed that traditional notions of res judicata and comity[1] require that the valid judgments of other courts be given preclusive effect in the Court of Federal Claims. But it is similarly beyond dispute that only valid judgments are deserving of preclusive effect. See, e.g., Restatement (Second) of Judgments § 17 (1982). And to be valid, a judgment must be within the issuing court's subject matter jurisdiction. See, e.g., Restatement (Second) of Judgments § 11 (1982) ("A judgment may properly be rendered against a party only if the court has authority to adjudicate the type of controversy involved in the action.").

This does not mean, of course, that a judgment of questionable validity is always susceptible to collateral attack. See Ins. Corp. of Ir., Ltd. v. Compagnie des Bauxites de Guinee, 456 U.S. 694, 702 n.9 (1982); Christopher Village v. United States, 360 F.3d 1319, 1329-30 (Fed Cir. 2004). Rather, "[w]hen a court has rendered a judgment in a contested action, the judgment precludes the parties from litigating the question of the court's subject matter jurisdiction in subsequent litigation except if: (1) [t]he subject matter of the action was so plainly beyond the court's jurisdiction that its entertaining the action was a manifest abuse of authority; or (2) [a]llowing the judgment to stand would

---

[1] Comity, both in the notional sense of courteous respect and in the more legalistic sense of the federal full faith and credit statute, 28 U.S.C. § 1738. See Davis v. Davis, 305 U.S. 32, 40 (1938) (establishing that the federal full faith and credit statute extended the Full Faith and Credit Clause to federal courts).

3

substantially infringe the authority of another tribunal or agency of government." Restatement (Second) of Judgments § 12 (1982).

On several occasions, the Supreme Court has taken the opportunity to address the circumstances under which a collateral attack to an extra-jurisdictional judgment may be maintained. For example, in United States v. United States Fidelity & Guarantee Co., the Court considered whether "a former judgment against the United States on a cross-claim, which was entered without statutory authority, fixing a balance of indebtedness to be collected as provided by law, [is] res judicata in [a subsequent] litigation for collection of the balance." 309 U.S. 506, 507 (1940). The Court decided that such a judgment was without res judicata effect, explaining: "It has heretofore been shown that the suability of the United States . . . depends on affirmative statutory authority. Consent alone gives jurisdiction to adjudge against a sovereign. Absent that consent, the attempted exercise of judicial power is void." Id. at 514. See also Kalb v. Feuerstein, 308 U.S. 433, 438–39 (1940) (permitting collateral attack on judgment where Congress had limited the issuing court's jurisdiction); Durfee v. Duke, 375 U.S. 106, 114 (1963) ("To be sure, the general rule of finality of jurisdictional determinations is not without exceptions. Doctrines of federal pre-emption or sovereign immunity may in some contexts be controlling.").

Relying on this precedent, this court has established a framework for determining when we will sustain a collateral attack. In Christopher Village v. United States, we considered whether a decision of the Fifth Circuit, holding that the Department of Housing and Urban Development ("HUD") had violated its statutory and contractual duties, should be given res judicata effect by the Court of Federal Claims. 360 F.3d

4

1319, 1324-26 (Fed. Cir. 2004). The Fifth Circuit had explained that its ruling was a "predicate for a damages action against HUD in the Court of Federal Claims." Christopher Village v. Restinas, 190 F.3d 310, 315 (5th Cir. 1999). Ultimately, we held that if the prior decision was (a) issued without subject matter jurisdiction and (b) the court's lack of jurisdiction "directly implicates issues of sovereign immunity," then the prior decision should be considered void and without res judicata effect. Christopher Village, 360 F.3d at 1332 (quoting Int'l Air Response v. United States, 324 F.3d 1376, 1380 (Fed. Cir. 2003).[2] These requirements are met when a district court or one of the circuit courts of appeals decides an issue that is properly within the exclusive jurisdiction of the Court of Federal Claims. Id. at 1332-33. Applying this framework, we determined that the Fifth Circuit's decision was void and should not be given preclusive effect. Id. at 1333.

The majority here does not disagree that the Christopher Village framework should guide our decision in the present appeal. Instead, applying that framework, the majority somehow finds that the D.C. Circuit's writ of mandamus in Northern States I was within that court's jurisdiction. I cannot agree. In my judgment, the D.C. Circuit established a clear predicate to a damages action and exceeded its jurisdiction when it issued the writ of mandamus in Northern States I; that extra-jurisdictional act implicates issues of sovereign immunity by interfering with the exclusive jurisdiction of the Court of Federal Claims.

---

[2]    The D.C. Circuit has similarly held: "[I]t is axiomatic that, before a judgment can have issue preclusive effect under the doctrines of either res judicata or collateral estoppel, that judgment must be valid." Davis v. Chevy Chase Fin. Ltd., 667 F.2d 160, 172 (D.C. Cir. 1981).

2007-5083

III.

The D.C. Circuit's jurisdiction is defined by the NWPA, which provides in relevant part: "Except for review in the Supreme Court of the United States, the United States courts of appeals shall have original and exclusive jurisdiction over any civil action . . . for review of any final decision or action of the Secretary [of Energy], the President, or the Commission under this part." NWPA, § 119 (codified at 42 U.S.C. § 10139(a)(1)(A)). In PSEG Nuclear, LLC v. United States, this court acknowledged "that agency actions mandated under Title III [of the NWPA] which relate to the creation of repositories for spent nuclear fuel fall within the class of actions subject to review by the courts of appeals under section 119." 465 F.3d 1343, 1349 (Fed. Cir. 2006). We explained, however, that the courts of appeals' section 119 jurisdiction is limited:

> [S]ection 302 of the NWPA only required that the DOE include certain obligations in its contracts. Therefore, judicial review as to whether the DOE properly incorporated these obligations within its contracts may fall within the jurisdiction conferred to the courts of appeals in section 119. However, the performance of and any damages for failure to meet those obligations were not provided for by statute. The claims at issue here involve only issues of whether the DOE breached its contractual obligations, and if so, to what damages, if any, PSEG is entitled for the breach. Because these are not within the DOE's statutory obligations under the NWPA, City of Burbank [v. United States, 273 F.3d 1370 (Fed. Cir. 2001),] does not compel us to conclude that section 119 of the NWPA strips the Claims Court of its Tucker Act jurisdiction over PSEG's claim merely because the claim involves a statutorily mandated provision.

Id. at 1350. Similarly, in Wisconsin Electric Power v. Department of Energy, the D.C. Circuit decided that, although the NWPA "grants the court jurisdiction over cases seeking review of: (1) final action taken by the agency pursuant to the NWPA, and (2) the agency's failure to take any action required by the NWPA[,] . . . a contract breach by

6

the DOE does not violate a statutory duty. The Court of Federal Claims, not this court, is the proper forum for adjudicating contract disputes." 211 F.3d 646, 648 (D.C. Cir. 2000) (internal quotation marks and citation omitted). The D.C. Circuit's jurisdiction—and the full extent to which the United States waived its sovereign immunity to suit in the regional courts of appeals—is thus limited to review of agency action or inaction under the statute itself.[3] Accordingly, the disagreement here boils down simply to whether the D.C. Circuit's Northern States I order is directed to agency action under the NWPA or to agency action in a contract dispute. In my view, it is unquestionably directed to and aimed at the contract dispute. By doing so, the D.C. Circuit acted beyond its statutory jurisdiction. The majority parses this issue by concluding that the mandamus order "did not address any issue of contract breach, direct the implementation of any remedy, or construe any contract defense" but rather only directed the DOE to comply with its statutory obligations. Maj. Op. at 33. Notwithstanding their cleverly worded interstitial attempt in limiting the interpretation of liability by the D.C. Circuit, the majority cannot avoid the obvious legal conclusion that this affects the damages imposed upon the United States. The majority's position is clearly erroneous.

Beginning in the opening paragraph of the Northern States I decision, the D.C. Circuit condemns the "DOE's current approach toward contractual remedies" and "preclud[es] DOE from advancing any construction of the Standard Contract that would

---

[3] It is undisputed that the D.C. Circuit's authority to issue writs under the All Writs Act, 28 U.S.C. § 1651(a), does not exceed the boundaries of the court's jurisdiction. See Clinton v. Goldsmith, 526 U.S. 529, 535 (1999); In re Princo Corp., 478 F.3d 1345, 1351 (Fed. Cir. 2007) ("The authority of the courts of appeals to issue the writ 'is restricted by statute to those cases in which the writ is in aid of their respective jurisdiction.'") (quoting Roche v. Evaporated Milk Ass'n, 319 U.S. 21, 25 (1945)).

7

excuse its delinquency on [certain grounds]." 128 F.3d at 756. Elsewhere in its opinion, the D.C. Circuit states: "Petitioners' ability to enforce the contract would be frustrated if DOE were allowed to operate under a construction of the contract inconsistent with our prior conclusion that the NWPA imposes an obligation on DOE without qualification or condition." Id. at 759 (internal quotation marks omitted). Indeed, the court explained that its writ "necessarily means, of course, that DOE not implement any interpretation of the Standard Contract that excuses its failure to perform on the grounds of acts of Government in either its sovereign or contractual capacity." Id at 760 (internal quotation marks omitted). There is no question that throughout its Northern States I opinion, the D.C. Circuit targets the interpretation of the Standard Contract and the way in which a contract action may proceed. Under our decision in PSEG, this is unquestionably outside the D.C. Circuit's jurisdiction and is a direct encroachment on the jurisdiction of our court and that of the Court of Federal Claims. PSEG, 465 F.3d at 1350 (explaining that the D.C. Circuit does not have jurisdiction over questions concerning "whether the DOE breached its contractual obligations, and if so, to what damages, if any [the utility] is entitled for the breach" because these issues are not "within the DOE's statutory obligations" but exist entirely by way of the contract).[4]

Indeed, even the D.C. Circuit recognized that "breach by the DOE [of the Standard Contract] does not violate a statutory duty." Northern States Power Co. v. Dep't of Energy, No. 97-1064, 1998 WL 276581, at *2 (D.C. Cir. May 5, 1998) (per curiam). But the D.C. Circuit's mandamus is directed precisely and explicitly to the

---

[4]    And, of course, if the D.C. Circuit does not have jurisdiction under §119, it does not have any jurisdiction at all, since actions not brought under the NWPA's review provision, even if properly brought under the general provisions of the Administrative Procedure Act, would have to be filed in the district courts.

8

issue of "remedies" for a breach. According to the D.C. Circuit, because the statute required an unconditional acceptance of SNF by January 31, 1998, the DOE could not defeat the utilities' claims for damages by arguing that the Standard Contract's Unavoidable Delays clause applied. But an inquiry into whether a contract contains a certain term is separate from an inquiry into what circumstances entitle a party to a remedy for breach of that term. The NWPA permits the D.C. Circuit to perform the former inquiry, but not the latter. See PSEG, 465 F.3d at 1350.

The text of the Unavoidable Delays clause demonstrates that the inquiries are separate. It states that "[n]either the Government nor the Purchaser shall be liable under this contract for damages caused by failure to perform its obligations hereunder, if such failure arises out of causes beyond the control and without the fault or negligence of the party failing to perform." 10 C.F.R. § 961.11 at Article IX.A. (emphasis added) (1983). In other words, the issue of remedy, and specifically whether there should be no remedy because of "unavoidable delay," only applies if a party has failed to perform its obligations under the contract. Therefore, contrary to the premise of the D.C. Circuit's mandamus, whether the DOE uses the Unavoidable Delays clause to minimize or prevent having to pay damages for failing to meet the "unconditional obligation" to begin disposing of SNF by January 31, 1998, is a separate inquiry from whether the contract properly incorporates the statutorily mandated unconditional deadline into its terms. Moreover, the statute is entirely silent on the issue of contractual remedies (or even whether the contract has to provide any monetary damages at all). Therefore, there is no reasonable argument here that the D.C. Circuit's jurisdiction could extend to any reliance by the DOE on the Standard Contract's Unavoidable Delays clause.

9

Additionally, the D.C. Circuit's writ of mandamus prohibits the DOE from construing the Unavoidable Delays clause to excuse its failure to dispose of SNF by January 31, 1998. See Northern States I, 128 F.3d at 756 ("We . . . issue a writ of mandamus precluding DOE from advancing any construction of the Standard Contract that would excuse its delinquency on the ground [of Unavoidable Delay]."). This order is no different than a declaratory judgment construing the Unavoidable Delays clause as excluding delay caused by the government's failure to prepare a permanent repository or storage facility for the SNF by January 31, 1998. A declaratory judgment as to the proper construction of a contractual term is a quintessential adjudication of a contract dispute and can only be adjudicated in the Court of Federal Claims. Wisconsin Elec. Power Co., 211 F.3d at 648 ("The Court of Federal Claims, not this court, is the proper forum for adjudicating contract disputes.").

The majority concedes that the D.C. Circuit interpreted the Unavoidable Delays clause.[5] Maj. Op. at 33 ("[The mandamus order] did not . . . construe any contract defense <u>except</u> to the extent that the government's proposed interpretation of the contract would conflict with the statutory directive of section 302(a)(5).") (emphasis added). Yet, inexplicably, the majority considers the D.C. Circuit's action "not meaningfully different" from the D.C. Circuit's statutory construction of the NWPA in <u>Indiana Michigan Power</u>. Maj. Op. at 30. The NWPA, as construed by the D.C. Circuit,

---

[5]    Even the concurring opinion agrees that the D.C. Circuit interpreted the Standard Contract by establishing government liability. See Concur. Op. at 1 ("I read the majority as establishing government liability . . . "). But it then attempts to cabin the scope of the majority's opinion by arguing that "it remains open for the government to argue that the Unavoidable Delays clause bars a damages award (as opposed to some other contractual remedy such as restitution)." Id. at 2. This argument, however, is in the same league as the interstitial argument made by the majority and has no more legs to stand upon than the majority's opinion.

10

obligates the DOE to accept SNF by January 31, 1998, and to include such an unconditional obligation in its Standard Contracts. Indiana Michigan Power, 88 F.3d at 1277. No one disputes that the Standard Contract contains such an unconditional obligation. Whether the DOE then nullified this provision by interpreting the Unavoidable Delays clause to excuse its non-performance is an entirely different issue that involves contract interpretation, not statutory construction. While the D.C. Circuit's holding in Indiana Michigan Power will undoubtedly inform a court's interpretation of whether or not having a repository or facility constitutes Unavoidable Delay under the contract, relying on statutory provisions to interpret contractual ones does not make the interpretive task any less grounded in an issue of contract interpretation. The majority fails to recognize this distinction when it approvingly notes that "based on its interpretation of the NWPA, the D.C. Circuit held that the government's failure to have a repository ready by January 31, 1998, could not be excused as unavoidable delay." Maj. Op. at 31. This is another failure of the majority to recognize that the D.C. Circuit interpreted the Standard Contract.

The majority's attempt to maintain comity with the D.C. Circuit by distinguishing between liability qua breach and liability qua damages is, in my view, not intellectually defensible. First, it is unclear to me how this supposed distinction is functional in the context of the Unavoidable Delays clause, which is directed to "liab[ility] for damages." And second, even if the clause was amenable to linguistic parsing of this sort, I fail to see how such a distinction would place the D.C. Circuit's Northern States I decision within that court's jurisdiction. Specifically, the question of breach is every bit as much within the exclusive jurisdiction of the Court of Federal Claims as is the question of

11

damages. Indeed, the predicate decision in <u>Christopher Village</u>, which this court determined was void and without res judicata effect, was directed solely and explicitly to the question of breach, not damages. 360 F.3d at 1324. Accordingly, in my judgment the D.C. Circuit's <u>Northern States I</u> decision exceeded that court's jurisdiction; it is not amenable to interpretation so as to give it validity.

IV.

Because the majority holds simply that the D.C. Circuit's <u>Northern States I</u> decision did not exceed that court's jurisdiction, it does not need to reach the second prong of the <u>Christopher Village</u> analysis—whether the extra-jurisdictional act implicates the United States' sovereign immunity. My disagreement over the issue of jurisdiction, however, requires me to continue the analysis. The D.C. Circuit's extra-jurisdictional writ interferes with the exclusive jurisdiction of the Court of Federal Claims, thereby implicating the United States' sovereign immunity. As we explained in <u>PSEG</u>:

> The Tucker Act generally vests the Court of Federal Claims with jurisdiction to render judgment in government contract disputes. This jurisdiction is supplanted only if, in a specific jurisdictional statute, Congress grants exclusive jurisdiction over a contract dispute to another court. The NWPA did not strip the Court of Federal Claims of its jurisdiction over [breach of contract] claims because it did not vest that jurisdiction in another court.

465 F.3d at 1349 (citations omitted). The APA affects a limited waiver of the United States' sovereign immunity from suit. In particular, 5 U.S.C. § 702 states in relevant part:

> A person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof. An action in a court of the United States seeking relief other than money damages . . . shall not be dismissed nor relief therein be denied on the ground that it is against

12

the United States . . . . The United States may be named as a defendant in any such action, and a judgment or decree may be entered against the United States . . . . Nothing herein

. . .

(2) confers authority to grant relief if any other statute that grants consent to suit expressly or impliedly forbids the relief which is sought.

See Consol. Edison Co. of New York, Inc. v. Dep't of Energy, 247 F.3d 1378, 1382–83 (Fed. Cir. 2001) ("Under specified circumstances, the APA waives sovereign immunity for actions challenging agency actions in district court . . . . Section 702 [of the APA] denies this sovereign immunity waiver to claims for money damages or for claims that seek remedies 'expressly or impliedly' precluded by other statutes."). Section 704 adds a further limitation: "Agency action made reviewable by statute and final agency action for which there is no other adequate remedy in a court are subject to judicial review." 5 U.S.C. § 704. The APA's waiver is thus tempered by no fewer than three restrictions on suit: (1) the action cannot be for money damages; (2) the action cannot be expressly or impliedly forbidden by another statute; and (3) the action cannot be one for which adequate remedy is available elsewhere.

A.

In Bowen v. Massachusetts, the Supreme Court considered the first restriction on the APA's waiver of sovereign immunity—that the action may not be for "money damages." Explaining that not all monetary relief is necessarily "money damages," the Court held that "money damages" in Section 702 is properly understood as compensatory rather than specific relief. 487 U.S. at 895–97. The Court then held that the Commonwealth of Massachusetts's suit was not one "seeking money in

13

compensation for the damage sustained by the failure of the Federal Government to pay as mandated; rather, it [was] a suit seeking to enforce the statutory mandate itself, which happens to be one for the payment of money." Id. at 900 (emphasis removed).

The D.C. Circuit's writ of mandamus in Northern States I presents a scenario that is the converse of Bowen. The D.C. Circuit did not offer specific relief; indeed, it acknowledged that it has no authority to do so. Rather, the D.C. Circuit ordered what is, in effect, compensatory relief. Specifically, the D.C. Circuit interpreted contractual terms by distinguishing between the treatment of avoidable and unavoidable delays under Article IX of the Standard Contract, Northern States I, 128 F.3d at 759 (explaining that avoidable delays result in money damages whereas unavoidable delays create no liability), and precluded the DOE from relying on the unavoidable delays provision, id. at 760. The D.C. Circuit exceeded its jurisdiction in doing so and by its writ thus obligated the DOE to pay compensatory damages in a subsequent breach of contract action. Therefore, even under Bowen's broad view of Section 702, the D.C. Circuit's writ of mandamus exceeds the "other than money damages" limitation on the APA's waiver of sovereign immunity.

Since Bowen, the Supreme Court has adopted a narrower and clearer position on the issue:

> Almost invariably . . . suits seeking (whether by judgment, injunction, or declaration) to compel the defendant to pay a sum of money to the plaintiff are suits for 'money damages,' as that phrase has traditionally been applied, since they seek no more than compensation for loss resulting from the defendant's breach of legal duty.

Great-West Life & Annuity Ins. Co. v. Knudson, 534 U.S. 204, 210 (2002) (internal quotation marks and citation omitted). Certainly, the D.C. Circuit's writ is addressed to nothing more than compensation for loss resulting from the DOE's alleged breach of its

14
2007-5083

contractual obligations. It would thus appear to be beyond question that the writ runs afoul of the Supreme Court's most recent view of "money damages" and is, therefore, beyond the scope of the APA's waiver of sovereign immunity.

The precedents of this court require the same result. For example and as acknowledged by the majority, in Christopher Village we held that "[a] party may not circumvent the Claims Court's [now the Court of Federal Claims's] exclusive jurisdiction by framing a complaint in the district court as one seeking injunctive, declaratory or mandatory relief where the thrust of the suit is to obtain money from the United States." 360 F.3d at 1328 (quoting Consolidated Edison Co. of New York, Inc. v. Dep't of Energy, 247 F.3d 1378, 1385 (Fed. Cir. 2001)). But the majority fails to recognize that the D.C. Circuit did exactly that in Northern States I—it circumvented the Court of Federal Claims's exclusive jurisdiction by crafting its order as a writ of mandamus that interprets the Standard Contract thereby removing the contractual shield of protection held by the United States. This is a subterfuge to provide the power companies with a means to obtain money damages from a now-defenseless United States in a later breach of contract action. This clearly is tantamount to a money mandate infringing upon our jurisdiction, the jurisdiction of the Court of Federal Claims, and the sovereign immunity of the United States.

B.

Moreover, as explained above, contract claims are within the exclusive jurisdiction of the Court of Federal Claims. See Roberts v. United States, 242 F.3d 1065, 1068 (Fed. Cir. 2001). Therefore, the Tucker Act, which waives sovereign immunity and confers jurisdiction on the Court of Federal Claims in cases sounding in

15

contract, "impliedly forbids relief other than the remedy provided by the Court of Federal Claims." Presidential Gardens Assocs. v. United States, 175 F.3d 132, 143 (2d Cir. 1999) (quotation marks omitted).

There is little room for debate that Nebraska Power's rights are contractual. But for the existence of the contract, there would be no right at all. Nor can it be contested that the relief sought in Northern States I was contractual—Nebraska Power requested a writ of mandamus ordering the United States to perform on its contract.[6] Moreover, the relief granted by the D.C. Circuit was contractual—a writ of mandamus precluding the DOE from relying on a contract defense in a future breach-of-contract action. The action before the D.C. Circuit in this case neither presented an independent statutory claim, nor would a breach of contract by the DOE be contrary to statute. See N. States Power Co., 1998 WL 276581, at *2 (D.C. Cir. May 5, 1998) (per curiam) ("While the statute requires the DOE to include an unconditional obligation in the Standard Contract, it does not itself require performance. Breach by the DOE does not violate a statutory duty . . . ."). The D.C. Circuit's writ is thus properly viewed as contractual relief, cf. Katz v. Cisneros, 16 F.3d 1204, 1209 (Fed. Cir. 1994) (distinguishing between "declaratory relief in the performance of a contract" and "judicial interpretation of a federal regulation"), and is impliedly forbidden by the Tucker Act. For this additional reason, the D.C. Circuit's action exceeded the APA's waiver of sovereign immunity.

## C.

Finally, the APA's waiver of sovereign immunity does not apply if an adequate remedy is available elsewhere. 5 U.S.C. § 704. The availability of monetary damages

---

[6] The power companies came to court dressed in sheep's clothing but in fact obtained a result that would be the envy of any pack of wolves.

16

2007-5083

in the Court of Federal Claims is an adequate remedy under Section 704. See Telecare Corp. v. Leavitt, 409 F.3d 1345, 1349 (Fed. Cir. 2005); Christopher Village, 360 F.3d at 1327 ("[A] litigant's ability to sue the government for money damages in the Court of Federal Claims is an adequate remedy that precludes an APA waiver of sovereign immunity in other courts.") (internal quotation marks omitted). Here, as the D.C. Circuit recognized, monetary damages are available to the utilities in the Court of Federal Claims. See Northern Power I, 128 F.3d at 756 ("[T]he Standard Contract between DOE and the utilities provides a potentially adequate remedy . . . ."). Accordingly, an adequate remedy is available, and the APA does not waive the United States' sovereign immunity in the D.C. Circuit.

--o0o--

Notwithstanding the protective fervor with which the majority persists in defending the jurisdiction of the D.C. Circuit by interstitially parsing liability and damages, I believe that the D.C. Circuit exceeded the limits of its jurisdiction under section 119 of the NWPA when it granted the writ of mandamus ordering a contractual remedy. It trespasses upon and limits the jurisdiction of our Court and the Court of Federal Claims. This essentially emasculates our law established by Christopher Village. Without a basis of jurisdiction under section 119, the D.C. Circuit's opinion directly interfered with the government's sovereign immunity. Unlike its decision in Indiana Michigan Power, the D.C. Circuit's writ of mandamus in Northern States I directly impacts the ability of the government to defend itself against having to pay money damages (and indirectly, will also result in the payment of damages), is forbidden by the Tucker Act, and thus falls outside the limits of Section 702's waiver of

17

2007-5083

sovereign immunity. I can appreciate the majority's attempt to avoid criticism of a sister court, but the sheer mushy applesauce consistency of the majority opinion in avoiding a jurisdictional confrontation with the D.C. Circuit should be obvious.[7] On this basis, the trial court's ultimate holding to void the mandamus was correct and should be affirmed.

---

[7] See Zuni Public School Dist. No. 89 v. Dep't of Educ., 550 U.S. 81, 113 (2007) (Scalia, J., dissenting).

18