# United States Court of Appeals for the Federal Circuit

2008-5108

CAROLINA POWER & LIGHT COMPANY
and FLORIDA POWER CORPORATION,

Plaintiffs-Appellees,

v.

UNITED STATES,

Defendant-Appellant.

Brad Fagg, Morgan, Lewis & Bockius LLP, of Washington, DC, argued for plaintiffs-appellees. With him on the brief was David M. Kerr.

Harold D. Lester, Jr., Assistant Director, Commercial Litigation Branch, Civil Division, United States Department of Justice, of Washington, DC, argued for defendant-appellant. With him on the brief were Michael F. Hertz, Acting Assistant Attorney General, Jeanne E. Davidson, Director, Alan J. Lo Re, Assistant Director, Marian E. Sullivan, Senior Trial Counsel, and Christopher J. Carney, Lisa L. Donahoe, Andrew P. Averbach, and Stephen Finn, Trial Attorneys. Of counsel on the brief was Jane K. Taylor, Attorney, Office of the General Counsel, United States Department of Energy, of Washington, DC.

Appealed from: United States Court of Federal Claims

Judge Thomas C. Wheeler

# United States Court of Appeals for the Federal Circuit

2008-5108

CAROLINA POWER & LIGHT COMPANY
and FLORIDA POWER CORPORATION,

Plaintiffs-Appellees,

v.

UNITED STATES

Defendant-Appellant

Appeal from the United States Court of Federal Claims in 04-CV-37C, Judge Thomas C. Wheeler.

———————————————————

DECIDED:  July 21, 2009

———————————————————

Before MAYER, RADER, and BRYSON, <u>Circuit Judges</u>.

RADER, <u>Circuit Judge</u>.

The United States Court of Federal Claims entered judgment in the amount of $82,789,289 against the United States for the Department of Energy's (DOE's) partial breach of its contract with certain nuclear utilities.  <u>Carolina Power & Light Co. v. United States</u>, 82 Fed. Cl. 23 (2008) (<u>CP&L I</u>).  Because the trial court based its award on a damages model expressly rejected by this court in <u>Pacific Gas & Electric Co. v. United States</u>, 536 F.3d 1282 (Fed. Cir. 2008), this court affirms in part and vacates and remands in part.

I.

In this case as in others, the record shows that the United States partially breached its contracts with domestic nuclear utilities to store high-level nuclear waste

(HLW) and spent nuclear fuel (SNF).  A detailed factual background appears in several other opinions of this court.  <u>See, e.g.,</u> <u>Yankee Atomic Elec. Co. v. United States</u>, 536 F.3d 1268 (Fed. Cir. 2008); <u>Me. Yankee Atomic Power Co. v. United States</u>, 225 F.3d 1336 (Fed. Cir. 2000).

The plaintiffs in this case are Carolina Power & Light Company (CP&L) and Florida Power Corporation (FPC) (collectively, following the convention of the trial court, Progress Energy).  Progress Energy operates five nuclear reactors at four power stations in North Carolina, South Carolina, and Florida.  The power plants are known as Harris, Brunswick, Robinson, and Crystal River.

Under the Nuclear Waste Policy Act of 1982 (NWPA), Pub. L. No. 97-425, 96 Stat. 2201 (codified at 42 U.S.C. §§ 10101-10270), Progress Energy entered into a "Standard Contract" with DOE.  Under that contract, DOE obligated itself to take title to and dispose of Progress Energy's SNF and HLW, starting no later than January 31, 1998.  As consideration for this performance, the contract required Progress Energy to pay one-time and recurring quarterly fees.  Through December 31, 2005, Progress Energy has paid some $661 million in fees to DOE under the Standard Contract.

DOE partially breached its contractual obligations by failing to perform waste acceptance in accordance with the Standard Contract.  <u>See</u> <u>Ind. Mich. Power Co. v. United States</u>, 422 F.3d 1369, 1376-77 (Fed. Cir. 2005); <u>Me. Yankee</u>, 225 F.3d at 1343. The parties in this litigation do not dispute this conclusion.  Instead, they dispute the amount of mitigation damages owed to Progress Energy for that breach.  Progress Energy has incurred substantial mitigation costs in storing SNF that otherwise would have been stored by DOE under the contract.

2008-5108                               2

The Standard Contract did not articulate a firm rate at which DOE would accept and dispose of SNF and HLW. Instead, the Standard Contract required DOE to issue annual capacity reports (ACRs), beginning no later than July 1, 1987, setting forth projected yearly receiving capacity for government nuclear waste storage facilities. Additionally, the Standard Contract required DOE to issue annual acceptance priority rankings (APRs) to identify the order in which SNF and HLW would be collected from various parties, based on a first-in, first-out queue model. In response to these APRs, the utilities submitted a delivery commitment schedule (DCS) to identify the spent fuel ready for delivery beginning sixty-three months after the DCS submission. This court has referred to this iterative process as the acceptance capacity schedule or ACS process. See Pac. Gas, 536 F.3d at 1286.

During a nine-day trial, the parties in this case presented evidence regarding DOE's fuel acceptance rate obligations under the Standard Contract and the actual expenses borne by Progress Energy as a result of the government's breach. The trial court, while recognizing that the Standard Contract lacked a firm rate of fuel acceptance, interpreted the Standard Contract as including obligations "that would achieve the goals of the NWPA." CP&L I, 82 Fed. Cl. at 37. Focusing on the purported motivation behind Congress's enactment of the NWPA, the court stated:

> It is apparent to the Court that the NWPA's purpose was to establish one or more central repositories for the storage of spent nuclear fuel so that nuclear utilities would not need to provide for additional spent fuel storage at their reactors. . . .
>
> The NWPA mandated that DOE's mission plan contain an estimate of "the total repository capacity required to safely accommodate the disposal of all high-level radioactive waste and spent nuclear fuel expected to be generated through December 30, 2020 . . . ." § 10221(a)(9). All of DOE's

early mission plans, and related statements and actions, reflect an intent to achieve this objective . . . .

Id. at 37.

Based on this standard, the trial court adopted plaintiffs' argument that a rate of 3000 metric tons of uranium (MTUs) was a reasonable measure of DOE's performance absent the breach. The trial court credited a model prepared by Progress Energy based on waste allocations under a 3000 MTU rate to determine what steps the utilities would have taken to store SNF had DOE begun accepting fuel in 1998. The trial court derived this model from the rates set forth in the 2004 version of DOE's ACR, which contemplated spent fuel acceptance at a permanent repository beginning in 2010. The trial court rejected the government's damages analysis, which was based upon a lower acceptance rate of 900 MTUs dictated by the 1991 ACS. Under the United States's theory of damages, the 1991 ACS would have entitled Progress Energy to recover $47,755,006. The trial court also rejected the government's arguments that certain overhead costs in the amount of $4,231,710 were not recoverable because they were fixed costs not incremental to the breach.

The government now appeals from the trial court's judgment dated June 19, 2008, awarding plaintiffs the amount of $82,789,289. Notably, on August 7, 2008, this court issued a decision in Pacific Gas identifying the appropriate SNF acceptance rate as that identified in the June 1987 ACS – a rate advocated by neither party in the instant case. This court has jurisdiction under 28 U.S.C. § 1295(a)(3).

II.

This court must vacate the trial court's judgment because it is premised upon a damages model this court expressly rejected in Pacific Gas. In Pacific Gas, this court

identified the 1987 ACS as "the most reasonable measure of the contractual acceptance rate." 536 F.3d at 1292.

In Pacific Gas, this court reviewed the Court of Federal Claims's selection of the 1991 ACS as the proper acceptance rate for measuring damages. This court noted with approval the trial court's decision to rely on the ACS process, rather than an implied specific acceptance rate of 3000 MTU per year. Id. at 1290 ("[T]he ACR process provides the most suitable – and perhaps only – method of setting the rate.") (internal quotation marks omitted). However, this court explicitly rejected the trial court's selection of the 1991 ACS process as the most accurate reflection of the parties' intent for full contractual performance. In particular, the 1991 ACS process was influenced by the "linkage requirements" of the Nuclear Waste Policy Amendments Act of 1987, which precluded DOE from commencing construction on an interim storage facility until the Nuclear Regulatory Commission authorized a permanent storage repository, thereby making the government's full performance a remote possibility. See Pub. L. No. 100-203, §§ 5001-5065, 10 Stat. 1330 (codified in scattered sections of the NWPA, 42 U.S.C. §§ 10101-10270) (1987 Amendments Act). This court stated:

> [T]he record shows that the linkages imposed by the 1987 Amendments presented the specter of an impending breach. This specter necessarily tainted the 1991 report. With strict linkages and no resolution of the permanent repository problem forthcoming, DOE's timely performance of its full contractual obligations had, by then, already become a distant possibility. In fact, in its June 1988 report, DOE explained that the linkage provisions made "operations of and waste acceptance at a DOE facility significantly before 2003 unlikely." . . . For these reasons, among others, this court concludes that the 1991 report does not present an acceptable acceptance rate under the Standard Contract.

Id. at 1291 (citation omitted).

As discussed in detail in <u>Pacific Gas</u>, this court instead chose the June 1987 ACS process as the best metric to gauge the parties' contractual intent. The 1987 ACS process occurred before Congress imposed the linkage requirements of the 1987 Amendments Act, at a time when "both the DOE and the nuclear utilities realistically expected that DOE would accept SNF/HLW on schedule." 536 F.3d at 1291. "The 1987 ACR process therefore provides the best available pre-breach snapshot of both parties' intentions for an acceptance rate." <u>Id.</u> at 1292.

In the instant case, because the trial court improperly relied on the 2004 ACR process for calculating damages, this court remands for a determination of damages based on the proper ACS – the 1987 schedule identified in <u>Pacific Gas</u> as the appropriate measuring stick for determining the parties' contractual intent.

The government argues that remand is inappropriate because Progress Energy has waived the right to prove damages under the 1987 rates, having already had that opportunity once at trial. The government further argues that plaintiffs should be restricted to the only other evidence currently in the trial record other than the 2004 ACS process – evidence proffered by the government of damages under the 1991 rates. To the contrary, Progress Energy's decision to pursue a damages theory based on the 2004 ACS process does not provide the government a free pass to reap the benefits of the 1991 rates explicitly rejected in <u>Pacific Gas</u>. The plaintiffs in this case cannot be expected to have forecasted the outcome of that intervening decision. This court will not penalize Progress Energy for pressing its litigation forward in good faith without awaiting the outcome of other similar litigations.

Progress Energy's brief evinces a similar reluctance to face remand, positing that the "slight" difference between the 1987 and 2004 ACS processes does not materially alter the damages causation analysis. Progress Energy argues that the same real-world SNF mitigation storage activities that would have been rendered unnecessary if DOE had performed at the 2004 acceptance rate obligations, as calculated by the trial court, would have also been rendered unnecessary if DOE had performed at the 1987 rate prescribed by Pacific Gas. In particular, plaintiffs argue that there was sufficient nuclear waste storage margin in each of their spent fuel pools at the 2004 rate of assumed DOE performance to cover the difference in the 1987 rate. In short, according to Progress Energy, damages at the 1987 rates are at least as much as at the 2004 rate. Therefore, according to their contentions, remand is unnecessary.

Testing Progress Energy's theory that the 1987 and 2004 rates are immaterially different is a profoundly factual endeavor. This appellate court is not prepared to make those factual findings. As the government correctly points out, Progress Energy raised this theory for the first time in a post-trial reply brief, after the close of the evidentiary record. Thus, the dozens of pages of charts and counterfactual analysis in appellees' brief dedicated to this argument have never been tested during discovery or subject to cross-examination at trial. Though, as Progress Energy points out, the practical equivalency of the 1987 and 2004 rates may well be a matter that can be tested by fairly simple arithmetic, it is nonetheless a factual issue properly within the purview of the trial court. As the Supreme Court has stated:

> The trial judge's major role is the determination of fact, and with experience in fulfilling that role comes expertise. Duplication of the trial judge's efforts in the court of appeals would very likely contribute only

negligibly to the accuracy of fact determination at a huge cost in diversion of judicial resources.

Anderson v. Bessemer City, 470 U.S. 564, 574-75 (1985); see also Pullman-Standard v. Swint, 456 U.S. 273, 291 (1982) ("[Factfinding] is the basic responsibility of district courts, rather than appellate courts . . . ."). Thus, this court rejects Progress Energy's invitation to engage in appellate fact-finding.

III.

This court next turns to the government's argument that the Court of Federal Claims improperly awarded certain fixed overhead and indirect costs that were not incremental to the breach. At issue are two categories of indirect expenses. The first is "stores overhead," which consists primarily of warehousing costs and related labor costs, for which the trial court awarded $2,336,679. Second are indirect overhead expenses in the amount of $1,895,031, which consist mainly of the salaries of managers and financial employees. The government argues that Progress Energy supplied no evidence that these additional overhead expenses were attributable to participation in breach-related activities.

This court affords the Court of Federal Claims wide discretion in assessing an appropriate quantum of damages. Hi-Shear Tech. Corp. v. United States, 356 F.3d 1372, 1382 (Fed. Cir. 2004) (citing Ferguson Beauregard v. Mega Sys., 350 F.3d 1327, 1345 (Fed. Cir. 2003) ("Determining the amount of damages to award . . . is not an exact science, and the methodology of assessing and computing damages is committed to the sound discretion of a district court.")). "[T]he clear error standard governs a trial court's findings about the general type of damages to be awarded (e.g., lost profits), their appropriateness (e.g., foreseeability), and rates used to calculate them (e.g.,

discount rate, reasonable royalty)." <u>Home Sav. of Am. v. United States</u>, 399 F.3d 1341, 1347 (Fed. Cir. 2005).

As the trial court noted, the undisputed record shows that Progress Energy diverted warehousing and management resources to mitigation projects. <u>CP&L I</u>, 82 Fed. Cl. at 48. The unrebutted record also shows that Progress Energy's internal accounting system uses specific codes to allocate a portion of stores overhead and other indirect overhead expenses to particular projects, including the breach-related projects. <u>Id.</u>

The government points to only one example where additional warehousing work needed to construct a dry storage project at one of Progress Energy's plants was charged directly to that project and thus already included in plaintiffs' damages claim. However, the record shows that overhead and indirect costs awarded to Progress Energy were, as a whole, properly allocated. As one of plaintiffs' employees testified with regard to allocation of indirect management costs,

> it's done on a plant-by-plant basis based on the amount of activity that is planned and what percentage of their time we anticipate will be spent supporting projects . . . . And then that percentage of their labor costs is then applied proportionally to the projects that are underway during that period of time.

Trial Tr. 408:15-25, Nov. 6, 2007. The record also shows that if Progress Energy had not applied stores overhead to the breach-related projects at issue in this case, other activities would have assumed a disproportionate amount of the total overhead costs. The record thus shows that the trial court did not clearly err in holding that Progress Energy should be allowed to recover an appropriate portion of these indirect overhead costs.

The government further argues that the trial court did not account for costs that plaintiffs avoided as a result of not being required to load SNF to DOE. In particular, the government argues that because of the government's breach, Progress Energy has avoided the contractually required costs of loading DOE's transportation casks upon arrival to accept spent fuel. The avoided cost of loading DOE casks, in the government's estimation, amounts to $9,818,462.

This court rejects the argument that Progress Energy has avoided the costs of loading casks such that the government should benefit from an offset in the damages award. Plaintiffs have not avoided the costs of loading. Rather, they have merely deferred these costs. Under this partial breach case, "[a]ll parties – the [utilities] and the government – retain their substantive rights and obligations under the contract." Yankee Atomic, 536 F.3d at 1281. "Just as the utilities cannot now collect damages not yet incurred under the ongoing contract, the government cannot prematurely claim a payment that has not become due." Id. The trial court noted that the Court of Federal Claims has uniformly rejected DOE's proposed cask loading reduction in its previous spent nuclear decisions because such an offset would effectively require utilities to pay loading costs twice. CP&L I, 82 Fed. Cl. at 52. This court agrees. The trial court did not clearly err in finding that Progress Energy will have to pay the loading costs the government now seeks to impose when DOE arrives to pick up Progress Energy's spent fuel in the future.

IV.

Because the trial court employed a damages model at odds with this court's decision in Pacific Gas, this court vacates and remands the award for recalculation

under the aegis of the 1987 ACS process.  However, this court affirms the portion of the damages award directed to overhead costs and other indirect expenses.

<u>AFFIRMED-IN-PART</u>, <u>VACATED-IN-PART</u>, and <u>REMANDED</u>

NO COSTS