# United States Court of Appeals for the Federal Circuit

---

**SOUTHERN NUCLEAR OPERATING COMPANY, ALABAMA POWER COMPANY,** AND **GEORGIA POWER COMANY,**
*Plaintiffs-Appellees,*

v.

**UNITED STATES,**
*Defendant-Appellant.*

---

2008-5020

---

Appeal from the United States Court of Federal Claims in 98-CV-614, Senior Judge James F. Merow.

---

Decided: March 11, 2011

---

M. STANFORD BLANTON, Balch & Bingham LLP, of Birmingham, Alabama, argued for plaintiffs-appellees. With him on the brief were ED. R. HADEN and K.C. HAIRSTON. Of counsel on the brief were RONALD A. SCHECHTER, JEFFREY L. HANDWERKER and MATTHEW M. SHULTZ, Arnold & Porter LLP, of Washington, DC.

ANDREW P AVERBACH, Senior Trial Counsel, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, DC, argued for the

defendant-appellant. With him on the brief were TONY WEST, Assistant Attorney General, JEANNE E. DAVIDSON, Director, and ALAN J. LO RE, Assistant Director. Of counsel was HAROLD D. LESTER, JR., Attorney. Of counsel on the brief were MARIAN E. SULLIVAN, Senior Trial Counsel, JAMES P. CONNOR, LISA L. DONAHUE and SHARI A. ROSE, Trial Attorneys; and JANE K. TAYLOR, Office of the General Counsel, United States Department of Energy, of Washington, DC.

---

Before LINN, SCHALL, and DYK, *Circuit Judges*.

DYK, *Circuit Judge*.

Plaintiffs Southern Nuclear Operating Company, Alabama Power Company, and Georgia Power Company (collectively, "plaintiffs") filed suit in the Court of Federal Claims ("Claims Court") against the United States, alleging that the United States Department of Energy ("Energy") had partially breached contracts by failing to accept spent nuclear fuel ("SNF") for storage beginning on January 31, 1998. The Claims Court granted summary judgment for plaintiffs on liability. It then held a trial to determine damages for storage costs incurred that would not have been necessary if Energy had fulfilled its obligation to begin accepting SNF in 1998. *S. Nuclear Operating Co. v. United States*, 77 Fed. Cl. 396, 460 (2007). The Claims Court also determined that the United States waived its defense that the "unavoidable delays" clause of its contracts precluded expectancy damages. *Id.* at 452–59. We vacate-in-part the damage award and remand to the Claims Court for further consideration with respect to two of three power plants. We affirm the damage award as to one plant. We also affirm the Claims Court's conclusion that the United States waived its "unavoidable delays" defense.

BACKGROUND

In January 1983, Congress passed the Nuclear Waste Policy Act of 1982, Pub. L. No. 97-425, 96 Stat. 2201 (codified as amended at 42 U.S.C. §§ 10101–270 (1987)) [hereinafter NWPA], under which all nuclear utilities entered into a Standard Contract with Energy. These contracts obligated the utilities to pay fees into the Nuclear Waste Fund. In return, Energy was obligated to pick up and store the utilities' SNF and high-level radioactive waste ("HLW"). The NWPA and Standard Contract obligated Energy to begin pick up by January 31, 1998. However, the contracts also contained an unavoidable delays clause. In 1987, Congress amended the NWPA, requiring Energy to develop only one permanent geologic repository for nuclear waste and forbidding Energy from constructing an interim storage facility until the Nuclear Regulatory Commission authorized the permanent facility. In part because of these constraints, Energy was unable to begin accepting SNF in 1998 as required by the statute and by contract.

On July 29, 1998, plaintiffs filed their complaint in the Claims Court, alleging partial breach of contract. In 2004, the court granted summary judgment on liability, finding that the government had partially breached the Standard Contract by failing to begin accepting SNF in January 1998. There is no issue on appeal as to liability; liability in these SNF cases has been established. *See Neb. Pub. Power Dist. v. United States*, 590 F.3d 1357 (Fed. Cir. 2010) (en banc). The facts revolve around two main issues—the calculation of plaintiffs' damage award and the government's alleged waiver of its "unavoidable delays" defense with respect to expectancy damages.

I

In 2005, the Claims Court held a trial on damages. The plaintiffs sought "reimbursement of their actual costs spent mitigating [Energy's] delays." *S. Nuclear*, 77 Fed. Cl. at 399. These costs were for construction of on-site storage at their plants that would not have been necessary had Energy performed its contractual obligations. In essence, the parties agreed that damages were the costs the plaintiffs actually incurred to store SNF in the real world less the costs that the plaintiffs would have incurred to store SNF had Energy performed.

The plaintiffs alleged that they incurred additional storage costs at three different power plants: Plant Hatch, Plant Farley, and Plant Vogtle.[1] At Plant Hatch, they sought damages for the cost of constructing an Independent Spent Fuel Storage Installation ("ISFSI") as well as the cost of dry storage casks for the ISFSI and the expenses incurred in loading the casks onto the ISFSI. ISFSIs are essentially concrete pads constructed to store dry storage casks and located adjacent to (rather than inside) reactor buildings. Dry storage casks are steel containers designed to hold (and prevent leakage of) SNF when it is removed from the reactor. At Plant Farley, plaintiffs also sought reimbursement for an ISFSI as well as for storage casks and loading costs. Lastly, at Plant Vogtle, plaintiffs sought damages for the cost of "reracking." Reracking is a method of increasing wet storage (i.e., storage inside the reactor pool), as opposed to using dry storage casks. It involves purchasing higher density

---

[1] Plaintiffs Southern Nuclear Operating Co., Georgia Power Co., and Alabama Power Co. are subsidiaries of Southern Co., a holding company. Alabama Power owns Plant Farley. Georgia Power holds a majority interest in Plants Hatch and Vogtle. Southern Nuclear operates all three plants.

storage racks so that more SNF can be stored in the wet pools adjacent to the core rather than transferred to a dry storage installation (like an ISFSI) outside of the reactor building. The United States argued that these storage costs at all three plants would also have been incurred in the non-breach world (i.e., if Energy had performed) and that, therefore, the government's breach did not cause the plaintiffs to make these expenditures.

However, determining what costs would have been incurred absent Energy's breach proved difficult because the Standard Contract itself did not specify a rate at which Energy was obligated to pick up SNF. Instead, the Standard Contract required Energy to issue annual capacity reports ("ACRs"), stating which plants would be granted pick-up allocations first and projecting how much SNF would be accepted by Energy. The ACRs, issued annually, included both an industry-wide pick-up rate and projected pick-up allocations for each individual plant. In 2008, we held in *Pacific Gas & Electric Co. v. United States*, 536 F.3d 1282, 1292 (Fed. Cir. 2008), that the Standard Contract required Energy to accept SNF at the rates set forth in the 1987 ACR. However, the Claims Court issued its opinions in this case in 2007 (and this appeal was stayed). Therefore, at the time of the 2007 decision, neither the parties nor the Claims Court knew that the 1987 ACR rates were contractually required.

At trial, the government argued that the court should use the 1991 ACR acceptance rates, approximately 900 metric tons of uranium ("MTU") per year, as the rates required by the Standard Contract. The plaintiffs, conversely, urged the court to use a 3000 MTU per year acceptance rate to determine how much SNF Energy would have picked up in the non-breach world. Neither party advocated for the 1987 ACR rates, which ramped up to approximately 2650 MTU per year. The Claims Court

explicitly declined to determine a particular contractual acceptance rate. Instead, the Claims Court concluded that "the reracking at Plant Vogtle and the dry storage at Plants Hatch and Farley would not have occurred if [Energy] had been performing at any reasonable rate [defined as between 2000 and 3000 MTU per year]." *S. Nuclear*, 77 Fed. Cl. at 439. It then continued that, "[e]ven at the [lower] rates under the December 1991 ACR, . . . storage shortages would likely have been accommodated" in the non-breach world (i.e., the additional storage facilities would not have been required). *Id.* Therefore, the Claims Court concluded that the plaintiffs' mitigation measures were incurred as a result of Energy's breach, and it awarded $2,716,000 for the rerack at Plant Vogtle, $17,278,000 for dry storage costs at Plant Farley, and $57,203,080 for dry storage costs at Plant Hatch. *Id.* at 460.

With respect to Plant Hatch, the plaintiffs conceded that two so-called "bathtub racks" (a type of wet storage used within the reactor building for storing SNF), which they purchased in the real world, would also have been purchased for $3,186,000 in the non-breach world and that during the period in question here they would have saved the costs ($419,800) of installing one of the two "bathtub racks." The Claims Court offset the plaintiffs' damage award by only $419,800, even though the Claims Court recognized that the bathtub racks at Plant Hatch would have been purchased absent Energy's breach. The court awarded plaintiffs $3,186,000 for the purchase of these bathtub racks when totaling damages. On appeal, both parties agree that the $3,186,000 award was made in error.

After trial, the United States filed a motion for reconsideration, arguing that the Claims Court should have determined a specific rate at which Energy was contrac-

tually obligated to accept SNF and that the court erred in stating that at the 1991 ACR rates plaintiffs would not have built additional storage. On November 1, 2007, the Claims Court denied the motion, reiterating that even if it had accepted the government's proposed rate as set forth in the 1991 ACR, "the dry storage expenditures awarded would not have been incurred." *S. Nuclear Operating Co. v. United States*, 79 Fed. Cl. 135, 141 (2007) [hereinafter *Reconsideration Op.*]. The Claims Court concluded that at the 1987 ACR rates, "with the sufficient lead time in the nonbreach world, and with fuel management, burnup adjustments, swaps, increase in pickups etc, given the enormous expense and effort to build an ISFSI . . . for a relatively small amount of SNF, dry storage would not have been built at Plant Hatch." *Id.* at 142. The references are all types of fuel management techniques that can be used to avoid the need for dry storage. A "burnup adjustment" refers to changing how much energy is extracted from the nuclear fuel source. Increasing fuel burnups would reduce the amount of SNF discharge created by the process. A "swap" would involve the trading of acceptance allocations between different plants. An "increase in pickups" refers to an option available under the Standard Contract that would increase the plant's pick-up allocations.

## II

With respect to the unavoidable delays issue, the Claims Court held that the United States waived a defense based on the unavoidable delays clause of the Standard Contract. It found that the government "did not raise the unavoidable delays clause as an affirmative defense, nor contend that but for the mandamus order [issued by the District of Columbia Circuit], the unavoidable delays clause would be raised" in its pre-trial pleadings or at trial. 77 Fed. Cl. at 457. Furthermore, it noted

that the United States had raised the absence of a repository as a defense or had raised challenges to the jurisdiction of the District of Columbia Circuit in other cases. It stated, "[q]uestions of the validity or applicability of the D.C. Circuit's mandamus in this court . . . could have been raised but were not." *Id.* at 456.

The United States timely appealed both the damage award and the unavoidable delays decision in 2008. We stayed the appeal until 2010 pending the outcomes of *Yankee Atomic Electric Co. v. United States*, 536 F.3d 1268, 1272 (Fed. Cir. 2008), *Nebraska Public Power*, 590 F.3d at 1357, and *Carolina Power & Light Co. v. United States*, 573 F.3d 1271 (Fed. Cir. 2009). This court has jurisdiction under 28 U.S.C. § 1295(a)(3).

## DISCUSSION

We review legal conclusions of the Claims Court, including contract interpretation, de novo. *Yankee Atomic*, 536 F.3d at 1272. Factual findings are reviewed for "clear error." *Ind. Mich. Power Co. v. United States*, 422 F.3d 1369, 1373 (Fed. Cir. 2005).

## I

As recognized by plaintiffs, "damages amounted to the costs Southern actually incurred to store SNF less the costs that Southern would have incurred to store SNF had [Energy] performed its contracts." Appellee's Br. 5. The United States argues on appeal that the Claims Court failed to apply the contractually mandated 1987 ACR rates to "determine precisely which costs that [plaintiffs] incurred [in the real world] would have been avoided in the non-breach world." Appellants' Br. 21. According to the government, remand is required as to Plant Hatch and Plant Vogtle under *Yankee Atomic* and *Carolina Power & Light* to allow discovery and expert testimony

about plaintiffs' hypothetical expenditures at the 1987 ACR rates. The United States concedes that remand is unnecessary to calculate damages at Plant Farley because the damage award would not be any different under the 1987 ACR rates.

The plaintiffs contend that remand is unnecessary because the damage award as to Plant Hatch and Plant Vogtle would not differ using the 1987 ACR rates. They argue that the Claims Court, in its reconsideration opinion, applied the 1987 ACR rates to determine damages at Plant Hatch and, in its initial opinion, concluded that the plaintiffs' storage measures at all three plants would not have been necessary even at the 1991 ACR rates, which were more favorable to the government than the 1987 rates.

A

With respect to Plant Hatch, the government on appeal no longer challenges the Claims Court's conclusion that the plaintiffs would not have constructed dry storage absent Energy's breach. However, the government argues that the award should be reduced because of saved costs. These saved costs resulted from the fact that plaintiffs allegedly would have been required to employ certain alternative fuel management techniques at the 1987 ACR rates in the non-breach world to avoid building dry storage. In fact, the government asserts that the Claims Court itself recognized the necessity of alternative fuel management techniques when it stated that "*with fuel management, burnup adjustments, sawps, increase in pickups etc,* . . . dry storage would not have been built at Plant Hatch" in the non-breach world. *Reconsideration Op.* at 142 (emphasis added). Hence, it argues that the cost of these fuel management techniques was avoided in the real world and urges that remand is necessary for the

Claims Court to calculate the costs of these techniques and deduct them from the final damage award.

The United States admits that it did not present any evidence to the Claims Court about what costs would have been avoided at Plant Hatch in the non-breach world (and hence should be offset from the damage award) at the 1987 ACR rates or any other rate. It explains that it did not do so because its position was that all of the costs allegedly incurred by plaintiffs at Plant Hatch (i.e., the ISFSI, dry storage casks, and the cost of loading the casks) would also have been incurred if Energy had performed at the 1991 rates, but that other avoided costs (i.e., fuel management techniques, burnup adjustments, etc.) would not have been incurred. The government claims that, had it known the 1987 rates were controlling, it would instead have agreed that dry storage would not have been necessary in the non-breach world but that the damage award should be offset by avoided costs. Although the government does not state precisely what these avoided costs would have been, it suggests that they would include, inter alia, the "fuel management [techniques], burnup adjustments, swaps, increase in pickups, etc." mentioned by the Claims Court in its reconsideration opinion. *Reconsideration Op.*, at 142.

At Plant Vogtle, the government argues that plaintiffs would have needed to perform a rerack in 2007 even if Energy had performed because the 1987 ACR rates did not grant any SNF pick-up allocations to Plant Vogtle until 2007,[2] and the plaintiffs therefore would have

---

[2] The ACRs only projected pickup allocations for individual plants for the first ten years of the program (though 2007). Under the 1987 ACR, Plant Vogtle's first pickup allocation was in 2007. The 1991 ACR did not grant Plant Vogtle any pickup allocations for the first ten years. Therefore, under both the 1991 and 1987 rates,

exceeded their storage capacity before Energy began accepting SNF. Therefore, it claims, remand is necessary for the Claims Court to determine whether the cost of the rerack should have been included in the damage award or whether plaintiffs would have incurred that cost anyway in the non-breach world (albeit at a later date).[3]

The government asserts that *Yankee Atomic* and *Carolina Power* require use of the 1987 rate and require remand for the Claims Court to permit discovery, hear expert testimony, and thoroughly compare the expenditures in the breach and non-breach worlds at the 1987 ACR rates. In *Yankee Atomic*, we remanded because the Claims Court did not select *any* contractual rate and hence "did not acknowledge that . . . causation . . . depended on some comparison of the contractually-defined hypothetical world to the expenses actually incurred." 536 F.3d at 1274. Similarly, in *Carolina Power*, we remanded the case when the government challenged the Claims Court's use of a rate more favorable to the plaintiffs than the 1987 ACR rates to construct the hypothetical non-breach world. 573 F.3d at 1275–77. Although the plaintiffs failed to introduce evidence concerning damages under the 1987 rates at trial, we excused the failure because they could not "be expected to have forecasted the outcome of [our] intervening decision" in *Pacific Gas*. *Carolina Power*, 573 F.3d at 1275. Also, we noted that while the 1987 and 2004 rates might be "immaterially different," the case required remand because equivalency between the two had "never been tested during discovery or subject[ed] to cross-examination at trial." *Id.* at 1276.

---

Energy would not have picked up any SNF from Plant Vogtle through 2006.

[3] Presumably, the government argues that some savings would have occurred as a result of any delay in construction.

Such a determination, we said, was "a profoundly factual endeavor." *Id.*

As in *Carolina Power*, the Claims Court opinion here pre-dated the *Pacific Gas* decision. The government could not have been expected to predict our adoption of the 1987 rates. Whatever the merits of allowing the record to be reopened for the submission of evidence as to what would have occurred at the 1987 rates, we are bound by the *Carolina Power* decision. The latitude we have given to plaintiffs to reopen the record under *Carolina Power* must also be afforded to the government. However, we think that question should be addressed in the first instance by the Claims Court. Remand is appropriate so that the Claims Court, in the first instance, may consider the impact of *Pacific Gas*, *Yankee Atomic*, and *Carolina Power* on this particular case, and to determine whether the government should be allowed to reopen the record and engage in additional discovery or introduce new evidence (like expert reports and expert testimony) with respect to the costs that would have been incurred by plaintiffs at Plant Hatch and Plant Vogtle at the 1987 ACR rates. In this connection, we note the government's remarkable silence about the nature and amount of the costs it alleges the plaintiffs avoided by constructing their storage facilities at Plant Hatch. In order for the Claims Court to determine whether to reopen the record in this case, it will be necessary for the government to be precise about the nature and amount of the avoided costs it claims were involved.

In requiring the government to identify such costs with particularity, we recognize that with respect to both claimed costs and avoided costs, plaintiffs bear the burden of persuasion. As we held in *Yankee Atomic*, "[b]ecause plaintiffs . . . are seeking expectancy damages, it is incumbent upon them to establish a plausible 'but-for'

world." 536 F.3d at 1273 (quoting *Bluebonnet Sav. Bank FSB v. United States*, 67 Fed. Cl. 231, 238 (2005)). Contrary to the Claims Court, this burden extends to avoided costs, as we concluded in *Yankee Atomic*. Without the application of the correct acceptance rate in the but-for world, "the [*plaintiffs*] cannot show the expenses *they might have avoided*." *Id.* (emphasis added).[4]

The reason is that the "party incurring the relevant costs is in the best position to adduce and establish such proof." 11 Arthur L. Corbin & Joseph M. Perillo, *Corbin on Contracts* § 57.10 n.15 (rev. ed. 2005). Here, the plaintiffs are in the best position to determine both the costs they would have incurred and the costs they would have avoided. However, this does not mean the defendant is without any obligation. Plaintiffs cannot be expected to brainstorm every possible cost they would have saved in the non-breach world. Hence, a defendant must move forward by pointing out the costs it believes the plaintiff avoided because of its breach. *See Mech-Con Corp. v. West*, 61 F.3d 883, 886 (Fed. Cir. 1995) (shifting the burden of production, in context of determining overhead damages when the government delays indefinitely but requires the contractor to remain on stand-by, to the government to "present . . . argument showing that the contractor did not suffer . . . any loss because it was able to . . . take on other work during the delay"); 11 *Corbin on Contracts* § 57.10 (noting that although the burden to

---

[4]    The rule with respect to claims for reliance and restitution damages is different. In that context, the defendant has the burden to establish offsets for saved costs. *See, e.g.*, *Am. Capital Corp. v. Fed. Deposit Ins. Corp.*, 472 F.3d 859, 869 (Fed. Cir. 2006) (involving reliance damages); *Caroline Hunt Trust Estate v. United States*, 470 F.3d 1044, 1052 (Fed. Cir. 2006) (involving restitution damages).

prove lost profits is generally on the plaintiff, in some instances where it would be unfair to the plaintiff, "the burden of going forward with the evidence should be thrust on the defendant"). Only then does the burden shift to the plaintiff to incorporate those saved costs into its formulation of a plausible but-for world. Here, therefore, the government must identify the nature of the avoided costs in question on remand. Should the government fail to timely point out specific shortcomings in the plaintiff's causation proof on the issue of saved costs and, in appropriate circumstances, produce supporting evidence, the court is entitled to treat the issue as waived.

## II

The Standard Contract includes a clause titled "Unavoidable Delays by Purchaser or [Energy]," which states, in pertinent part:

> Neither the Government nor the Purchaser shall be liable under this contract for damages caused by failure to perform its obligations hereunder, if such failure arises out of causes beyond the control and without the fault or negligence of the party failing to perform. In the event circumstances beyond the reasonable control of the Purchaser or [Energy]—such as acts of God, or of the public enemy, acts of Government in either its sovereign or contractual capacity [etc] . . . cause delay in the scheduled delivery, acceptance or transport of SNF and/or HLW . . . the parties will readjust their schedules, as appropriate, to accommodate such delay.

J.A. 1047. Once it became clear to Energy that it would be unable to begin accepting SNF by January 1998 because of its inability to construct a permanent repository or interim storage facility, the agency issued its *Final*

*Interpretation of Nuclear Waste Acceptance Issues*, 60 Fed. Reg. 21,793 (May 3, 1995). Energy concluded that it "did not have an unconditional statutory or contractual obligation to accept [HLW and SNF] beginning January 31, 1998 in the absence of a repository or interim storage facility." *Id.* at 21,793–94; *see also Ind. Mich. Power Co. v. Dep't of Energy*, 88 F.3d 1272, 1274 (D.C. Cir. 1996).

However, in *Indiana Michigan*, the District of Columbia Circuit held that Energy's interpretation was contrary to the NWPA and found that the agency had an unconditional statutory obligation to begin accepting SNF by January 31, 1998. 88 F.3d at 1277. Subsequently, Energy's Contracting Officer reached a preliminary conclusion that excused Energy's failure to begin accepting SNF on the grounds that it was an "unavoidable delay" under the Standard Contract. In *Northern States Power Co. v. Department of Energy*, 128 F.3d 754, 760 (D.C. Cir. 1997), the District of Columbia Circuit found that the agency was attempting to avoid the statutory obligation imposed by the NWPA. Therefore, it issued a mandamus order "precluding [Energy] from excusing its own delay on the grounds that it has not yet prepared a permanent repository or interim storage facility." *Id.* at 761.

In this case, purportedly out of fear that raising the "unavoidable delays clause" as a defense in the Claims Court would result in sanctions under the *Northern States* order, the United States did not affirmatively assert such a defense. The United States argues that it could not have voluntarily or knowingly waived the defense because it "reasonably believed that it was compelled by the *Northern States* mandamus order, under threat of sanctions for contempt, from raising the Unavoidable Delays defense in this case." Appellant's Br. 30; *see also id.* at 2 ("[T]he United States was subject to a writ of mandamus from the United States Court of Appeals for the District of

Columbia Circuit specifically enjoining it from raising an argument based upon that contractual provision.").[5]  The government misreads the scope and purpose of the *Northern States* order.  The order did not foreclose the government from making arguments in the Claims Court.  Rather, it was directed toward a situation in which the agency itself issued a decision rejecting the premise of the court's *Indiana Michigan* decision.  The court's concern was that the agency itself would "implement [an] interpretation of the Standard Contract that excuse[d] its failure to perform," not that the agency might make arguments in the Claims Court.  *See Northern States*, 128 F.3d at 760.[6]

Following these decisions by the District of Columbia Circuit, the Claims Court held in *Nebraska Public Power* that the District of Columbia Circuit did not have jurisdiction over disputes under the Standard Contract and hence its mandamus order did "not preclude [the United States] from arguing . . . that it did not breach the Standard Contract based on the unavoidable delays clause."

---

[5]  To the extent the government also argues that it preserved its defense through Christopher Kouts' testimony, this argument must be rejected.  The government lawyer at trial acknowledged that what arguments it would make was "still a matter to be decided."  J.A. 860.  The United States did not actually *raise* the defense until its post-trial brief.

[6]  *See also N. States Power Co. v. United States*, 1998 WL 276581 (D.C. Cir. May 5, 1998) (rejecting rehearing petition and stating that Energy "suggest[s] that this Court has erroneously designated itself as the proper forum for adjudication of disputes arising under the Standard Contract . . . .  [W]e did not; we merely prohibited [Energy] from implementing an interpretation that would place it in violation of its duty under the NWPA to assume an unconditional obligation to begin disposal by January 31, 1998.").

*Neb. Pub. Power Dist. v. United States*, 73 Fed. Cl. 650, 674 (2006), *reversed and remanded*, 590 F.3d 1357 (Fed. Cir. 2010) (en banc).  In our en banc decision in *Nebraska Public Power*, we did not suggest that the District of Columbia Circuit's decisions in any way foreclosed arguing in favor of the defense in the Claims Court.  Indeed, we considered the government's argument and held that the District of Columbia Circuit had jurisdiction to enter the mandamus order and that its decision in *Northern States* was entitled to res judicata effect on the issue of liability but that it did not "direct the implementation of any remedy."  590 F.3d at 1363–65, 1376.

Finally, we note that despite its purported concerns, the government appeared to raise the unavoidable delays clause as a defense in *Nebraska Public Power* and two pre-*Nebraska Public Power* cases.  *See Boston Edison Co. v. United States*, 64 Fed. Cl. 167, 186–87 n.21 (2005); *Fla. Power & Light Co. v. United States*, 64 Fed. Cl. 37, 39 (2005).

Because the government failed to raise the unavoidable delays clause here and because this failure was not compelled by the District of Columbia Circuit's mandamus in *Northern States*, it has waived the defense.  We need not reach the question posed by the *Nebraska Public Power* concurrence as to whether the "unavoidable delays" clause could provide a defense to expectancy damages.  *See Nebraska Pub. Power*, 590 F.3d at 1376–77 (Dyk, J., concurring, with whom Linn, J., joins).

## III

As noted above, the parties agree that the Claims Court mistakenly included $3,186,000 in damages for bathtub racks at Plant Hatch that would also have been purchased in the non-breach world.  Therefore, its decision as to that damage award is vacated.

## IV

For the foregoing reasons, we affirm the Claims Court's determination as to waiver of the unavoidable delays defense, affirm its damage award as to Plant Farley, and vacate and remand its damage award as to Plant Hatch and Plant Vogtle for further proceedings consistent with this opinion.

### AFFIRMED-IN-PART, VACATED-IN-PART, and REMANDED

COSTS

No costs.